UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------------x
STATE OF CONNECTICUT OFFICE OF          :
PROTECTION AND ADVOCACY FOR PERSONS     :
WITH DISABILITIES, SHANNON HEMMINGSEN,  :
SAMUEL RIVERA, GALE YENCHA, NORMA JEAN  :
DIAZ, and AGATHA JOHNSON, individually  :
and on behalf of other similarly        :
situated individuals,                   :
                                        :
     Plaintiff,                         :   Civil Case No.
                                        :
v.                                      :   3:06CV00179(AWT)
                                        :
THE STATE OF CONNECTICUT, MICHAEL P.    :
STARKOWSKI, in his official capacity as :
Commissioner of the Connecticut         :
Department of Social Services, THOMAS A.:
KIRK, Jr., PhD., in his official        :
capacity as Commissioner of the         :
Connecticut Department of Mental        :
Health and Addiction Services, and J.   :
ROBERT GALVIN, M.D., M.P.H., in his     :
official capacity as Commissioner of    :
the Connecticut Department of Public    :
Health,                                 :
                                        :
     Defendants.                        :
----------------------------------------x
```

RULINGS ON DEFENDANTS' MOTIONS TO DISMISS AND
PLAINTIFFS' MOTION FOR CERTIFICATION OF CLASS

The State of Connecticut Office of Protection and Advocacy

for Persons With Disabilities ("OPA") and Shannon Hemmingsen,

Samuel Rivera, Gale Yencha, Norma Jean Diaz, and Agatha Johnson

(the "Individual Plaintiffs") bring this action on behalf of more

than 200 individuals with mental illness who reside in three

nursing facilities in Connecticut, and on behalf of individuals

with mental illness who are at risk of entry into those

-1-

facilities, against defendants the State of Connecticut; Michael
P. Starkowski, in his official capacity as Commissioner of the
Connecticut Department of Social Services; Thomas A. Kirk, Jr.,
Ph.D., in his official capacity as Commissioner of the
Connecticut Department of Mental Health and Addiction Services;
and J. Robert Galvin, M.D., M.P.H., in his official capacity as
Commissioner of the Connecticut Department of Public Health.  The
plaintiffs have moved to certify a class of individuals
consisting of those who:

> (1) have a mental illness or have a record of such an
> illness or have been regarded as having such an illness
> and therefore have a disability within the meaning of
> 42 U.S.C. § 12102(2);
>
> (2) with appropriate supports and service, could live
> in the community; and
>
> (3) are institutionalized in either Chelsea Place Care
> Center in Hartford ("Chelsea Place"), Bidwell Care
> Center in Manchester ("Bidwell"), or West Rock Health
> Care Center in New Haven ("West Rock")(collectively,
> the "Nursing Homes"), or are at risk of entry into
> these facilities.

(Motion to Certify Class (Doc. No. 129)("Pls. Class Mot.") at 2.)
The defendants have filed two motions to dismiss, asserting in
their 12(b)(6) motion that the plaintiffs have failed to state
claims upon which relief can be granted, and asserting in their
12(b)(1) motion that no plaintiff has standing to assert any of
the claims.  For the reasons set forth below, the defendants'
motions to dismiss are being denied and the plaintiffs' motion to
certify class is being denied to the extent that the plaintiffs

seek to have Agatha Johnson named as a class representative and granted in all other respects.

## I.   **BACKGROUND**

OPA is an authorized protection and advocacy agency as provided for by the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. § 10801, et seq. ("PAMII"). PAMII grants OPA the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care and treatment in the State. . . ."  42 U.S.C. § 10805(a)(1)(B). Congress enacted PAMII in 1986 "to ensure that the rights of individuals with mental illness are protected" and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes. . . ." 42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).

A Board of Protection and Advocacy for Persons with Disabilities (the "Advocacy Board") was established by the Connecticut legislature.

> The advocacy board shall advise the executive director of the Office of Protection and Advocacy for Persons with Disabilities on matters relating to advocacy policy, client service priorities and issues affecting persons with disabilities. Said advocacy board shall consist of fifteen members appointed by the Governor and be comprised of ten persons with disabilities or a parent or guardian of a person with a disability, at least four of

> whom shall represent developmentally disabled persons,
> and five persons who are knowledgeable in the problems of
> persons with disabilities including the state Americans
> with Disabilities Act coordinator and the chairperson for
> the Advisory Board of the Protection and Advocacy for
> Individuals with Mental Illness Program.

Conn. Gen. Stat. § 46a-9.  OPA was established pursuant to Conn.

Gen. Stat. § 46a-10.  Pursuant to Conn. Gen. Stat. § 46a-10, the

operations of OPA are administered by the executive director of

that office.  The executive director may "adopt regulations . . .

subject to the approval of [the Advocacy Board] . . ."  Conn.

Gen. Stat. § 46a-10.

In addition, as required by 42 U.S.C. § 10805(a)(6), OPA has

established a PAMII advisory council (the "Advisory Council")

which "will advise the system on policies and priorities to be

carried out in protecting and advocating the rights of

individuals with mental illness . . ."  42 U.S.C. § 10805(a)(6).

Nine of the ten Advisory Council members are consumers of mental

health services in Connecticut.  As part of its official duties,

the Advisory Council holds public meetings throughout the state,

reviews budgets and significant proposed expenditures, and

receives quarterly reports from the Executive Director.

The plaintiffs' factual contentions include the following:

> Among other things, Plaintiffs allege that Defendants
> have systematically failed to provide the Proposed Class
> with services in the most integrated setting appropriate
> to their needs, and instead have kept them needlessly
> segregated, inappropriately warehoused, and left without
> safeguards to ensure that they are discharged from the
> Nursing Homes when appropriate.  Defendants have also

-4-

> systematically failed to inform the Proposed Class of
> their right to community services, and failed to provide
> services with reasonable promptness.   Defendants have
> failed to enact policies or practices that assure that
> their services are administered to Plaintiffs in the most
> integrated setting appropriate to their needs . . .

(Pls. Class Mot. at 2.)   The First Amended Complaint contains the

following claims: in Count I, as to the individual defendants

only, for violation of the Americans with Disabilities Act, 42

U.S.C. § 12101, et seq. (the "ADA"), mandate to administer

services and programs in the most integrated setting appropriate;

in Count II, as to the individual defendants only, for violation

of the ADA's prohibition on using methods of administration that

subject individuals with disabilities to discrimination; in Count

III, as to all defendants, for failure to administer services in

the most integrated setting appropriate in violation of Section

504 of the Rehabilitation Act, 29 U.S.C. § 794 (the

"Rehabilitation Act"); and in Count IV, as to all defendants, for

violation of the Rehabilitation Act's prohibition on using

methods of administration that subject individuals with

disabilities to discrimination.   The plaintiffs seek declaratory

and injunctive relief that would require the defendants to

promptly take such steps as are necessary to enable members of

the putative class to receive services in the most integrated

setting appropriate to their needs.   OPA alleges that its

constituents have each suffered injuries that would allow them to

bring suit against the defendants in their own right.

**II.   MOTION TO DISMISS - - Rule 12(b)(6)**

**A.  Legal Standard**

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the
complaint and must draw inferences in a light most favorable to
the plaintiff.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).
Although a complaint "does not need detailed factual allegations,
a plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do."  <u>Bell Atlantic Corporation v.
Twombly</u>, 127 S.Ct. 1955, 1965 (2007).  "Factual allegations must
be enough to raise a right to relief above the speculative level,
on the assumption that all allegations in the complaint are true
(even if doubtful in fact)."  <u>Id</u>. (citations omitted).  The
plaintiff must plead "only enough facts to state a claim to
relief that is plausible on its face."  <u>Id</u>. at 1974.  "The
function of a motion to dismiss is 'merely to assess the legal
feasibility of the complaint, not to assay the weight of the
evidence which might be offered in support thereof.'"  <u>Mytych v.
May Dept. Store Co.</u>, 34 F. Supp. 2d 130, 131 (D. Conn. 1999),
quoting <u>Ryder Energy Distribution v. Merrill Lynch Commodities,
Inc.</u>, 748 F.2d 774, 779 (2d Cir. 1984).  "The issue on a motion
to dismiss is not whether the plaintiff will prevail, but whether

-6-

the plaintiff is entitled to offer evidence to support his claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784, 786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

**B. Discussion**

The defendants argue that the plaintiffs have failed to allege that the Individual Plaintiffs have been excluded from or denied participation in any program, service, or activity administered by the defendants because of their mental illness, or allege that they have been discriminated against or been the subject of an improper "method of administration" in any program, service or activity administered by the defendants.  (Memorandum in Support of Defendants' Rule 12(b)(6) Motion to Dismiss (Doc. No. 140)("Defs. 12(b)(6) Br.") at 10.)

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To

-7-

establish a violation of the ADA,

> the plaintiffs must demonstrate that (1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). The standards for the ADA "are generally the same as those required under section 504 of [the Rehabilitation Act for] federally assisted programs and activities." Id. In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

### 1. Integration Mandate

Pursuant to the grant of authority in 42 U.S.C. § 12134(a), the Attorney General issued a regulation requiring a "public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App.

-8-

A, p. 450 (1998).  See also 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d).

In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), the Supreme Court held that "[u]njustified [institutional] isolation . . . is properly regarded as discrimination based on disability." Id., at 597.  The Court reasoned that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 600-01.  See also Joseph S. v. Hogan, 561 F. Supp. 2d 280, 290 (E.D.N.Y. 2008)("Thus, unnecessary segregation of individuals with mental illness is discrimination per se and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is required."). The Court concluded that "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the

needs of others with mental disabilities." Olmstead, 527 U.S. at 607.

The defendants characterize Counts I and III as seeking a remedy "requiring the defendants to prevent institutionalization, to create community-based alternatives, and to place plaintiffs in such alternatives." (Defs. 12(b)(6) Br. at 15)(internal quotation marks omitted). The defendants argue that they are under no obligation to deinstitutionalize the plaintiffs. As to that point, they are correct. See Olmstead, 527 U.S. at 603 n.14 ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'"); Rodriquez v. City of New York 197 F.3d 611, 619 (2d Cir. 1999)("Olmstead does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions."). See also Flight v. Gloeckler, 68 F.3d 61, 64 (2d Cir. 1995)("challenges to the allocation of resources among the disabled under the Rehabilitation Act are disfavored.").

However, the plaintiffs do not request in the First Amended Complaint that the Individual Plaintiffs receive a certain level of care, but rather that the defendants cease using methods of administration that subject individuals with disabilities to discrimination and, instead, administer their programs and

-10-

services in a manner that leads to the most integrated setting
appropriate for each putative class member's needs.  Shannon
Hemmingsen, one of the Individual Plaintiffs, avers that she was
never given applications to fill out for other places to live.
Samuel Rivera, another Individual Plaintiff, attests that "I am
not aware that I ever had a discharge plan before I became a
plaintiff in this lawsuit, and as far as I am aware, I was never
evaluated for my ability to live in the community before the
people from [the Department of Mental Health and Addiction
Services] came to see me," which was a time after he had become
involved in this lawsuit.  (Affidavit of Samuel Rivera (Doc. No.
152) at ¶¶ 9-10.)

     The defendants point to the fact that the three Nursing
Homes, at which the Individual Plaintiffs reside, are privately
operated and administered and do not constitute programs,
services, or activities that are provided by a public entity
defendant.  They cite language from the ADA and the
Rehabilitation Act referencing a public entity.  See, e.g., 42
U.S.C. § 12132 ("no qualified individual with a disability shall
. . . be excluded from participation in or be denied the benefits
of the services, programs, or activities of a public entity, or
be subjected to discrimination by any such entity")(emphasis
added). However, the integration mandate requires defendants to
"administer services, programs, and activities in the most

integrated setting appropriate to the needs of qualified
individuals with disabilities."  28 C.F.R. § 35.130(d); <u>Martin v.
Taft</u>, 222 F. Supp. 2d 940, 981 (S.D.Ohio 2002).  Following the
logic of the defendants' argument, if Connecticut could structure
a mental health system that ensured its consumers resided in
privately-run facilities, it could avoid its legal obligations in
this area altogether.  But <u>Olmstead</u> made clear that the actions
of the state that led to a denial of integrated settings could
serve as the basis for an ADA claim.  <u>Olmstead</u> emphasized that
"under Title II of the ADA, <u>States</u> are required to provide
community-based treatment for persons with mental disabilities"
when appropriate.  <u>Id.</u>, at 607.  It is the defendants' conduct in
the administration of state programs that makes them proper
parties here.  <u>See</u> <u>Disability Advocates, Inc. v. Paterson</u>, 598 F.
Supp. 2d 289 (E.D.N.Y. 2009):

> It is immaterial that DAI's constituents are receiving
> mental health services in privately operated facilities.
> Public entities are required under the ADA to "administer
> services, programs, and activities in the most integrated
> setting appropriate to the needs of qualified individuals
> with disabilities." 28 C.F.R. § 35.130(d) (emphasis
> added). Discrimination, in the form of unjustified
> segregation of individuals with disabilities in
> institutions, is thus prohibited in the administration of
> state programs.  The statutory and regulatory framework
> governing the administration, funding, and oversight of
> New York's mental health services-including the
> allocation of State resources for the housing programs at
> issue here-involves 'administration' on the part of
> Defendants. The State cannot evade its obligation to
> comply with the ADA by using private entities to deliver
> some of those services.

Id. at 317-18.

### 2.  Methods of Administration

The defendants argue that Counts II and IV, which allege
that the defendants have engaged in methods of administration
that have the effect of subjecting individuals with mental
disabilities to discrimination in violation of the ADA and the
Rehabilitation Act, should be dismissed because the First Amended
Complaint lacks the specifics that are required to state a
plausible methods of administration claim, and that the First
Amended Complaint further fails to allege claims upon which
relief can be granted by not identifying any policy, practice,
criteria, or methods of administration that are employed in such
programs.  The defendants further argue that the plaintiffs have
made their allegations in the "broadest possible conclusory
fashion". (Defendants' Reply Brief in Support of Their Rule
12(b)(6) Motion to Dismiss (Doc. No. 158)("Defs. 12(b)(6) Reply")
at 7.)

The ADA's and the Rehabilitation Act's prohibition on
discriminatory methods of administration, 28 C.F.R.
§ 35.130(b)(3) and 28 C.F.R. § 41.51(b)(3), respectively,
provides that a public entity (or, under the Rehabilitation Act,
an entity that receives federal financial assistance) may not
utilize methods of administration that (1) subject disabled
individuals "to discrimination on the basis of disability" or (2)

have the "purpose or effect of defeating or substantially impairing the accomplishment of the objectives" of the program or activity with respect to individuals with disabilities.  <u>See</u> 28 C.F.R. §§ 35.130(b)(3), 45.51(b)(3).

The defendants cite to <u>M.K. v. Sergi</u>, 554 F. Supp. 2d 175 (D. Conn. 2008), where the court observed at the summary judgment stage that the plaintiffs had "not produced any evidence that DCF employed 'criteria or methods of administration' that had the purpose or effect of substantially impairing accomplishment of the objectives of its program." <u>Id.</u> at 199.  Here however, at the motion to dismiss stage, the plaintiffs have alleged, <u>inter alia</u>, that:

> Defendants have failed to adequately assess and identify the long-term care needs of Plaintiffs and the Class they represent and to determine whether those needs could be appropriately met in integrated, community-based settings.  Moreover, Defendants have failed to inform Plaintiffs and the Plaintiff Class members of the availability of alternatives to nursing home care and have denied them the right to choose home and community-based services instead of institutional care.

(First Amended Complaint (Doc. No. 123)("Compl.") at ¶ 96.) Thus, the plaintiffs have adequately alleged a plausible methods of administration claim.

### 3. Definition of Disability

The defendants argue that the plaintiffs have failed to allege facts demonstrating that the Individual Plaintiffs have a disability within the meaning of the ADA and the Rehabilitation

Act.  In the ADA, that term means "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  The Rehabilitation Act utilizes the same definition for a "handicapped individual," 29 U.S.C. § 706(8)(B), and Congress intended to apply the same definition.  Bragdon v. Abbott, 524 U.S. 624, 631 (1998).

The defendants contend that the First Amended Complaint should be dismissed because the plaintiffs do not allege that the Individual Plaintiffs' mental illnesses limit their major life activities.  However, a review of the First Amended Complaint shows that this allegation has been made.  (See Compl. at ¶ 14 ("OPA's constituents have significant mental illnesses that substantially limit their ability to perform major life activities, such as self care, working, and interaction with others."), and at ¶ 152 ("Plaintiff OPA's constituents, the Individual Plaintiffs, and the Class are individuals with mental illnesses.  They have mental impairments that substantially limit one or more major life activity, such as self-care and interaction with others. They also have a record of such mental illnesses and are regarded by Defendants as having such mental illnesses.").)  The defendants argue that the allegations in the First Amended Complaint that address this point either apply to OPA's constituents generally, and not specifically to the

-15-

Individual Plaintiffs, or constitute characterizations that "are precisely the sort of conclusory allegations that need <u>not</u> be accepted as true for purposes of a motion to dismiss" (Defs. 12(b)(6) Reply at 20)(emphasis in original).  The court disagrees.  Particularly in the context of the other factual allegations in the First Amended Complaint with respect to the Individual Plaintiffs, the plaintiffs' have included in the First Amended Complaint allegations that are plausible in their face with respect to this element of their claims.

Accordingly, this motion to dismiss is being denied.

**III.  MOTION TO DISMISS - - Rule 12(b)(1)**

**A.   Legal Standard**

At the motion to dismiss stage, "standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." <u>Bauer v. Beneman</u>, 352 F.3d 625, 631 (2d Cir. 2003).  "[T]he standards for reviewing dismissals granted under 12(b)(1) and 12(b)(6) are identical." <u>Moore v. PaineWebber Inc.</u>, 189 F.3d 165, 169 n.3 (2d Cir. 1999).  "Because standing is challenged on the basis of the pleadings, we accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." <u>Bldg. and Constr. Trades Council of Buffalo, New York and Vicinity v. Downtown Dev., Inc.</u>, 448 F.3d 138, 144 (2d Cir. 2006) (internal quotation omitted).

## B.  Discussion

In order for a plaintiff to have Article III standing, there must be: "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." United Food & Com. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996).  OPA alleges injuries suffered by its constituents, and not by itself.  Thus, it relies on the doctrine of associational standing to satisfy the requirement that there be an injury in fact.  Under that doctrine, an association may "sue to redress its members' injuries, even without a showing of injury to the association itself. . . ."  Id. at 552.  The defendants contend that OPA does not have standing to sue, and that, in addition, the Individual Plaintiffs lack standing to assert the claims raised in the First Amended Complaint.

### 1.  OPA's Associational Standing

The test for associational standing has three prongs: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 553 (quoting Hunt v. Washington State Apple Adver. Comm'n., 432 U.S. 333, 343 (1977)).  The

-17-

Supreme Court has explained that the first two factors of the
Hunt test are required by the Constitution and the third prong is
a "judicially self-imposed limit on the exercise of federal
jurisdiction." Brown Group, 517 U.S. at 556 (citations and
alterations omitted).

In Hunt, the Supreme Court considered whether the Washington
State Apple Advertising Commission (the "Commission") had
standing to bring suit on behalf of that State's apple growers
and dealers.  The defendants argued that the Commission lacked
standing to do so because it was a state agency that did not have
any members, and thus had not suffered a concrete injury as
required by Article III.  The Supreme Court disagreed:

> The Commission, while admittedly a state agency, for all
> practical purposes, performs the functions of a
> traditional trade association representing the Washington
> apple industry.  As previously noted, its purpose is the
> protection and promotion of the Washington apple
> industry; and, in the pursuit of that end, it has engaged
> in advertising, market research and analysis, public
> education campaigns, and scientific research.  It thus
> serves a specialized segment of the State's economic
> community, which is the primary beneficiary of its
> activities, including the prosecution of this kind of
> litigation.
>
> Moreover, while the apple growers and dealers are not
> 'members' of the Commission in the traditional trade
> association sense, they possess all of the indicia of
> membership in an organization. They alone elect the
> members of the Commission; they alone may serve on the
> Commission; they alone finance its activities, including
> the costs of this lawsuit, through assessments levied
> upon them.  In a very real sense, therefore, the
> Commission represents the State's growers and dealers and
> provides the means by which they express their collective
> views and protect their collective interests.

-18-

Id. at 344-345.

In Paragraphs 16 to 26 of the First Amended Complaint, the plaintiffs set forth detailed factual allegations concerning OPA's relationship with its constituents.  Based on those allegations, the plaintiffs then allege:

> The above allegations demonstrate that OPA's constituents have the power to participate in and exert significant influence over OPA's policies, priorities and activities. OPA provides the means by which these constituents "express their collective views and protect their collective interests." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 345 (1977). OPA is therefore the functional equivalent of a traditional membership organization, and OPA's constituents possess sufficient indicia of membership in OPA so as to support OPA's associational standing to sue on their behalf.

(Compl. ¶ 27.)  The defendants disagree.

In Oregon Advocacy Center v. Mink, 322 F.3d 1101 (9th Cir. 2003), the defendants challenged the standing of a PAMII protection and advocacy organization to bring suit on behalf of mentally incapacitated criminal defendants on the grounds that "individuals with mental illness do not actually control the plaintiff's activities and finances." Id. at 1110 (quotation and alteration omitted).  In reaching the conclusion that the organization had associational standing, the court concluded, first, that the organization was the functional equivalent of a voluntary membership organization, and second, that the organization's constituents possessed indica of membership that resulted in the organization having a personal stake in the

-19-

outcome of the controversy.  As to the organization being the functional equivalent of a voluntary membership organization, the court concluded that OAC was the functional equivalent of such a voluntary membership organization because it "serves a specialized segment of Oregon's community: the disabled in general, including the mentally ill, and more specifically, incapacitated criminal defendants.  These groups are the primary beneficiaries of OAC's activities, 'including the prosecution of this kind of litigation.'"  <u>Id.</u> (quoting <u>Hunt</u>, 432 U.S. at 344).  As to the indicia of membership possessed by OAC's constituents, the court acknowledged that OAC lacked some of the indicia of membership possessed by the plaintiff in <u>Hunt</u>, noting that "OAC is funded primarily by the federal government, and not by its constituents. . . .  OAC's constituents are not the only ones who choose the leadership of the OAC, and they are not the only ones that may serve on OAC's leadership bodies."  <u>Id.</u> at 1111.  But the court concluded:

> Nevertheless, OAC's constituents do possess many indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a "personal stake in the outcome of the controversy."  <u>See</u> <u>Vill. of Arlington Heights</u>, 429 U.S. at 261, 97 S. Ct. 555 (internal quotation marks omitted).

<u>Id.</u>

As part of its analysis of the indicia of membership possessed by the organization's constituents, the court took note

of the provisions of PAMII which provide for the involvement of
individuals with mental illness and their family members in the
direction and control of a protection and advocacy organization:

> [T]he governing board of an organization like OAC, "shall
> be composed of . . . members . . . who broadly represent
> or are knowledgeable about the needs of the clients
> served by the system," where such members are defined to
> include "individuals who have received or are receiving
> mental health services and family members of such
> individuals." 42 U.S.C. § 10805(c)(1)(B). Also, a
> protection and advocacy system such as OAC must:
>
> > establish an advisory council . . . which shall
> > include individuals who have received or are
> > receiving mental health services, and family
> > members of such individuals, and at least 60
> > percent the membership of which shall be
> > comprised of individuals who have received or
> > are receiving mental health services or who are
> > family members of such individuals; and . . .
> > which shall be chaired by an individual who has
> > received or who is receiving mental health
> > services or is a family member of such an
> > individual.
>
> Id. § 10805(a)(6)(B-C). Furthermore, PAMII provides that
> a system such as OAC shall "establish a grievance
> procedure for clients or prospective clients of the
> system to assure that individuals with mental illness
> have full access to the services of the system and . . .
> to assure that the system is operating in compliance with
> the provisions" of PAMII. Id. § 10805(a)(9).

Id. (quotation omitted). It was clear, however, taking into
account these provisions of PAMII was only one factor in the
court's analysis because it stated that "[a]lthough we agree that
PAMII is relevant to OAC's standing, it cannot override
constitutional standing requirements." Id., at 1109.

The court took note of the fact that "people with

disabilities constitute a majority of OAC's board of directors
and that individuals who had received or were receiving mental
health services, or family members of such individuals, compose
more than 60 percent of the advisory council for OAC's PAMII-
funded program." Id., at 1112.  Based on the foregoing, the
court concluded that "[t]ogether, these circumstances suggest
that, [m]uch like members of a traditional association, the
constituents of the Advocacy Center possess the means to
influence the priorities and activities the Advocacy Center
undertakes." Id. (internal quotation mark omitted).

    The analysis in Mink was in accord with that in Doe v.
Stincer, 175 F.3d 879 (11th Cir. 1999).  In that case, the court
held that a PAMII protection and advocacy organization had
associational standing to bring suit on behalf of its
constituents under the analysis in Hunt.  First, the court
observed:

> To begin with, as in Hunt, Congress designated the
> Advocacy Center, like other protection and advocacy
> systems, to "serve[ ] a specialized segment of the . . .
> community which is the primary beneficiary of its
> activities, including prosecution of this kind of
> litigation."

Stincer, 175 F.3d at 886.  In addition, with respect to the
constituents possessing the indicia of membership, the court set
forth the following analysis:

> Further, under PAMII, individuals with mental illness
> possess "the indicia of membership in an organization."
> In PAMII, Congress directed that multi-member governing

-22-

boards of protection and advocacy organizations such as the Advocacy Center must be composed of "members who broadly represent or are knowledgeable about the needs of clients served by the system" and must "include individuals who have received or are receiving mental health services and family members of such individuals." 42 U.S.C. § 10805(c)(1)(B); see also 42 C.F.R. § 51.22(b)(2). Moreover, protection and advocacy organizations must have advisory councils, sixty percent of whose membership as well as the chair of the council must be "comprised of individuals who have received or are receiving mental health services or who are family members of such individuals." § 10805(a)(6)(B), (C); 42 C.F.R. § 51.23(b)(1), (2). Additionally, PAMII provides that a protection and advocacy organization must afford the public with an opportunity to comment on the priorities and activities of the protection and advocacy system and must establish a grievance procedure for clients and prospective clients "to assure that individuals with mental illness have full access to the services of the system" and "that the eligible system is operating in compliance with [PAMII]." § 10805(a)(8), (9); 42 C.F.R. §§ 51.24, 51.25.

Id. (citation omitted). Based on the foregoing, the court concluded that "[m]uch like members of a traditional association, the constituents of the Advocacy Center possess the means to influence the priorities and activities the Advocacy Center undertakes." Id. In so holding, the court declined to follow the reasoning in Ass'n of Retarded Citizens v. Dallas County Mental Health and Retardation Center Bd. of Trustees, 19 F. 3d 241 (5th Cir. 1994), where the court concluded that a federally funded organization authorized to protect and advocate for the rights of disabled individuals "bears no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people — are unable to

participate in and guide the organization's efforts."  Id. at
244.

Here, with respect to the requirement that OPA be the
functional equivalent of a voluntary membership organization, the
analysis in Mink and Stincer is directly on point.  The court
adopts that analysis.

The additional requirement is that OPA's constituents
possess indicia of membership such that OPA is sufficiently
identified with and subject to influence of those constituents so
as to have a personal stake in the outcome of this case.  In
Stincer, the court placed weight on the requirements under PAMII
with respect to the composition of multi-member governing boards,
the requirements under PAMII for the composition of advisory
councils, the requirement that the organization afford the public
with an opportunity to comment on its priorities and activities,
and the requirement that the organization establish a grievance
procedure for clients and prospective clients.  The analysis in
Mink was substantially the same.

Here, most of the same elements are present.  The exception
is the fact that Stincer and Mink placed weight on the
requirements under PAMII with respect to the composition of
multi-member governing boards.  Here, the Connecticut legislature
opted to adopt a structure that did not include a multi-member
governing board like the boards of directors in Stincer and Mink.

-24-

Thus, as opposed to a board of directors and an advisory council, as was the situation in Stincer and Mink, Connecticut has the Advocacy Board, OPA, the operations of which are administered by it's executive director, and the Advisory Council.  The requirements for the composition of the Advocacy Board, set forth in Conn. Gen. Stat. § 46a-9, are consistent with the requirements for a multi-member governing board in a public system, which are set forth in 42 U.S.C. § 10805(c)(1)(B)(i) ("The governing board shall be composed of . . . members . . . who broadly represent or are knowledgeable about the needs of the clients served by the system . . .").  In addition, although the Advocacy Board is not characterized as a board of the directors and it's role is to advise the executive director of OPA, by statute the Advocacy Board exercises oversight of OPA with respect to the adoption of regulations by the executive director of OPA.  This is a significant oversight function.  Also, it is significant that, by statute, the chairperson of the Advisory Council is a member of the Advocacy Board.  Thus, the presence and role of the Advocacy Board provides a means for constituents of OPA to influence the priorities and activities that OPA undertakes, even though the Advocacy Board is not a board of directors.

In addition, while the Advisory Council possesses all of the

attributes required by PAMII,[1] there are at least two attributes
of the Advisory Council that suggest that it has means in
addition to those specified by statute to influence the
priorities and activities of OPA.  First, "[t]he Council
considers, nominates, and appoints its own members, including its
chairperson.  OPA's Executive Director does not control or take
part in the election of new members to the Council. Members may
be removed only upon recommendation by the Council to the
Executive Director."  (Compl. ¶ 19.)  Thus, OPA does not control
the Advisory Council.  Second, the Advisory Council is the final
decision-maker with respect to grievances filed by persons with
disabilities or their representatives or family members.

> OPA has established a direct grievance procedure pursuant
> to 42 U.S.C. § 10805(a)(9), whereby persons with
> disabilities or their representatives or family members
> may file a written grievance with OPA where (1) there is

---

[1]The court notes that many of the functions performed by the
Advisory Council are ones that are specified by statute.  For
example, in Paragraph 16 of the First Amended Complaint, there is
a reference to the by-laws of the Advisory Council, which provide
that the Advisory Council's purpose includes advising PAMII
program staff and the governing authority, which is a specified
function under 42 U.S.C. § 10805(a)(6)(A); completing a section
of the annual PAMII program performance report, which is a
specified function under 42 U.S.C. § 10805(a)(7); and jointly
developing the annual statement of objectives and priorities of
the PAMII program, which is a specified function under 42 U.S.C.
§ 10805(a)(2)(B).  While the performance of these functions
serves to make the point that the Advisory Council performs the
functions it is expected to under the statutory scheme for PAMII,
the performance of these functions does not compensate for the
absence of a multi-member governing board when one is trying to
assess the degree to which OPA's constituents have the means to
influence its priorities and activities.

a disagreement about the decision of OPA not to provide
assistance or advocacy services; (2) there is
dissatisfaction regarding the quality or extent of
services provided; (3) there is a belief that OPA failed
to fulfill its legal obligations; or (4) there is a
belief that OPA has discriminated in the provision of its
services on the basis of disability, race, or another
prohibited basis.  The grievance procedure is designed
"to assure that individuals with mental illness have full
access to the services of the system."  42 U.S.C. §
10805(a)(9).  The Council makes the final decision
regarding the appropriate response to grievances filed
with OPA, and has the power to overrule the initial
determinations made by the PAIMI Program Director, the
Managing Attorney, and OPA's Executive Director.

(Compl. ¶ 26.)  The Advisory Council's authority with respect to

grievances is an important and very effective means of

influencing the priorities and activities of OPA.

Based on the combination of the presence and role of the

Advocacy Board, the influence of the Advisory Council beyond that

required by statute, and the existence of the statutorily

specified functions of the Advisory Council, together with the

requirements that there be an opportunity for public comment and

a grievance procedure for clients and prospective clients, the

court concludes that the constituents of OPA have the means to

influence the priorities and activities of OPA in a meaningful

way to such an extent that OPA is sufficiently identified with

and subject to the influence of its constituents so as to have a

personal stake in the outcome of this case.  See Laflamme v. New

Horizons, Inc., 605 F. Supp. 2d 378, 397 (D. Conn. 2009)("The

greater weight of authority, particularly within this circuit,

-27-

establishes that organizations like OPA routinely are found to fit within the requirements for associational standing under Hunt.").

The defendants also argue that Congress did not authorize PAMII organizations to sue on behalf of a group of their constituents, as opposed to suing on behalf of specific individuals. Courts have generally rejected this argument. In Brown v. Stone, 66 F. Supp. 2d. 412 (E.D.N.Y. 1999), the court analyzed the statutory language of 42 U.S.C. § 10801(b) and concluded that Congress intended for PAMII organizations to have standing to bring suit on behalf of "an identifiable group of individuals." Id. at 425. See also Trautz v. Weisman, 846 F. Supp. 1160, 1162 (S.D.N.Y. 1994) (concluding that the statute "clearly confers . . . the right to pursue legal remedies for the protection of mentally ill individuals.").

## 2. Standing of Individual Plaintiffs

To have standing to sue, the Individual Plaintiffs must allege facts demonstrating: (1) an injury in fact; (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. See Brown Group, Inc., 517 U.S. at 551.

The defendants contend that the Individual Plaintiffs fail to allege that they suffered an injury in fact that was caused by the actions of the defendants because they did not actually apply

for community based services nor identify which programs they
were denied access to, and thus the Individual Plaintiffs' claims
are based on their mere residence in one of the three Nursing
Homes.  These arguments echo the defendants' arguments in support
of the 12(b)(6) motion to dismiss.  Construing the plaintiffs'
claims as the court construes them in Part II.B., supra, the
Individual Plaintiffs have sufficiently alleged that they
suffered an injury in fact that was caused by the actions of the
defendants.

The defendants also contend that the plaintiffs are basing
their claims against the Commissioner of the Department of Public
Health ("DPH") on DPH's alleged failure to use its regulatory
authority against third parties for the benefit of the Individual
Plaintiffs, but have not shown that DPH is a substantial factor
in the third parties' actions.  This argument was raised in
Paterson, where the court noted:

> [I]t is clear that Defendants are required by State law
> to determine the settings in which New York provides and
> funds mental health services. Defendants do so by
> controlling the State's funding for services in various
> settings, including adult homes and supported housing,
> and effectively control how many adults receive services
> in any particular setting. This is more than a "general
> obligation to provide services," as Defendants contend.
> While State officials do not require anyone to be in an
> adult home, Defendants plan, fund and administer the
> State's existing service system such that more than
> 12,000 adults are receiving the State's services in adult
> homes.

Paterson, 598 F. Supp. 2d at 319.  Substantially the same

-29-

analysis applies here.

Accordingly, this motion to dismiss is being denied.

**IV.   MOTION TO CERTIFY CLASS**

**A. Legal Standard**

To maintain a class action, the plaintiffs must satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure – – numerosity, commonality, typicality, and adequacy of representation - - and show that the putative class falls within one of the three categories in Rule 23(b).  <u>See</u> Fed. R. Civ. Proc. 23; <u>In re IPO Sec. Litig.</u>, 471 F.3d 24, 33 (2d Cir. 2006).  The plaintiffs bring this putative class action pursuant to Rule 23(b)(2).  In evaluating a motion for class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

Id. at 41.

The party seeking certification has the burden of demonstrating that all of the requirements of Rule 23 are satisfied.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997).  A certified class may be decertified or modified at later stages.  Woe by Woe v. Cuomo, 729 F.2d 96, 107 (2d Cir. 1984).  Finally, "the district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  In re IPO Sec. Litig., 471 F.3d at 41.

**B. Discussion**

    **1.  Implicit Requirements**

"There are implicit requirements for the existence of an identifiable class and for the named representatives being members of the proposed class."  5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.20 (3d. ed. 2009).

"[T]he requirement that there be a class will not be deemed satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760, at 140 (3d ed. 2005); see In re A.H. Robins Co., Inc., 880 F.2d 709, 728 (4th Cir. 1989)("Though not specified in the Rule, establishment of a class action

-31-

implicitly requires both that there be an identifiable class and
that the plaintiff or plaintiffs be a member of such class"),
abrogated on other grounds, Amchem Products, Inc., 521 U.S. at
591.  "An identifiable class exists if its members can be
ascertained by reference to objective criteria."  In re Methyl
Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 209
F.R.D. 323, 337 (S.D.N.Y. 2002).

        The defendants argue that the proposed class definition does
not adequately define a definitive class because it incorrectly
assumes that all individuals in the Nursing Homes who "have a
mental illness or have record of such an illness or have been
regarded as having such an illness," by definition, have a
"disability" within the meaning of the ADA.  (Defendants'
Memorandum in Opposition to Plaintiffs' Motion For Class
Certification (Doc. No. 144)("Defs. Class Opp.") at 5.)  This,
they suggest, would lead to an unwieldly case-by-case
determination.  The defendants also object that the proposed
class definition of mental illness is unduly broad and "bears
absolutely no relationship" to the defendants' obligations,
making it "impossible to determine which individuals are members
of the proposed class."  (Defs. Class Opp. at 6.)  However, the
class is explicitly defined to include individuals whose mental
illnesses constitute disabilities as defined by the ADA.  Thus,
the members of the class can be identified by reference to the

objective criteria.  In addition, the requested relief is not community placement for each putative class member but rather cessation of current methods of administration and, instead, administration of programs and services in a manner that is consonant with Olmstead.  In rejecting a similar challenge, the court in Ligas v. Maram, No. 05 C 4331, 2006 U.S. Dist. LEXIS 10856 (N.D. Ill. Mar. 7, 2006), noted:

> In essence, the plaintiffs are willing to have the defendants make these determinations based on reasonable assessments from their own state treatment professionals in accordance with [Olmstead]. Because the defendants would be evaluating based on their own criteria whether a potential class member would meet the state's requirements and thus the class definition, [the] court could order the defendants to engage in individual determinations should any relief be granted and not do so itself.

Id. at 17.

The court finds defendants' other objections similarly unpersuasive.  The defendants argue that there has not been an explicit definition of an "appropriate support and service" (Defs. Class Opp. at 8), but this is clearly a reference to their obligations under Olmstead.  The defendants also argue that the third prong of the class definition, which includes individuals who are "at risk of entry" into state facilities, lacks adequate standards to allow feasible class membership determinations.  But again, this would be problematical only if the requested relief were community placement for each putative class member, as opposed to adoption of process that is consonant with Olmstead.

The defendants argue that OPA and the Individual Plaintiffs do not have standing, but the court has addressed those arguments in the context of the defendants' 12(b)(1) motion to dismiss. The defendants also point to certain facts that suggest that Individual Plaintiffs' claims may be or become moot.  However, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs .(TOC), Inc.</u>, 528 U.S. 167, 189 (2000)(internal quotation marks and citation omitted).

As to plaintiffs Norma Jean Diaz and Agatha Johnson, the defendants argue that they are not appropriate representatives because they have resisted or rejected efforts at community placement, which pre-date the filing of the First Amended Complaint.  With respect to Diaz, the defendants' argument is effectively rebutted by her affidavit.  However, the defendants' argument with respect to Johnson is supported by the affidavit of Laurel Reagan, and no affidavit of Johnson has been submitted in rebuttal.  Therefore, the court concludes, on this record, that Agatha Johnson would not be an appropriate representative.

## 2. Rule 23(a) Requirements

The potential class must satisfy the four requirements set forth in Federal Rule of Civil Procedure 23(a):

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

-34-

common to the class, (3) the claims or defenses of the
representative parties are typical of the claims or
defenses of the class, and (4) the representative parties
will fairly and adequately protect the interests of the
class.

Additionally, with respect to Rule 23(b), the plaintiffs seek to

maintain the class action under Rule 23(b)(2), which requires

that "the party opposing the class has acted or refused to act on

grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory

relief with respect to the class as a whole." Fed. R. Civ. Proc.

23(b)(2).

### a. Numerosity

The plaintiffs seek to represent a class they believe likely

exceeds 200 members, and they have produced evidence that 95

individuals qualify as potential class members.  "While there is

no predetermined number of plaintiffs necessary to certify a

class, courts generally have found a class consisting of 40 or

more members to be sufficient."  Collins v. Olin Corp., 248

F.R.D. 95, 101 (D. Conn. 2008)(citing cases).  "Courts have not

required evidence of exact class size or identity of class

members to satisfy the numerosity requirement."  Robidoux v.

Celani, 987 F.2d 931, 935 (2d Cir. 1993).

The defendants argue that the plaintiffs' proposed number is

speculative, but the exact number of potential plaintiffs is

unknown absent discovery.  When the exact number of eligible

persons is within the defendant's control, as it is here, "[i]t
is permissible for the plaintiffs to rely on reasonable
inferences drawn from the available facts." German v. Federal
Home Loan Mortg. Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995)
(citation omitted).

### b.  Common Questions of Law and Fact

"The commonality requirement is met if plaintiffs'
grievances share a common question of law or of fact." Marisol
A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).  Minor factual
differences will not preclude class certification if there is a
common question of law.  Monaco v. Stone, 187 F.R.D. 50, 61
(E.D.N.Y. 1999)(citation omitted).

The court agrees with the plaintiffs that they have
identified multiple issues of law and fact common to the entire
proposed class with respect to the alleged failure of the methods
of administration used by the defendants and the alleged failure
to administer programs in the most integrated setting
appropriate, including:

> Defendants' failure to establish and/or implement a
> comprehensive, effectively working plan to provide
> services in the most integrated setting appropriate to
> the proposed class's needs, segregation of the proposed
> class in the Nursing Homes, failure to inform the
> proposed class of their right to integrated community-
> based services, and failure to evaluate the proposed
> class for readiness for community placement.

(Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs'
Motion for Certification of Class (Doc. No. 146)("Pls. Class

-36-

Reply") at 5.)

### c. Typicality

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." Marisol A., 126 F.3d at 376.  "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).  Among the relevant considerations are "whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 510 (S.D.N.Y. 1996).

The defendants argue that because all the members of the putative class are not all eligible to participate in the same program, the plaintiffs have not shown how they might have been injured from the same course of events.  However, the "same course of events" relevant for purposes of this case is being discriminated against on the basis of a mental illness by virtue of the defendants' failure to administer their programs and services in a manner that leads to the most integrated setting appropriate for each putative class members' needs.  See, e.g.,

-37-

<u>Colbert v. Blagojevich</u>, No. 07 C 4737, 2008 WL 4442597, *7 (N.D.
Ill. Sept. 29, 2008)("Like the class members, the named
plaintiffs have an interest in requiring the defendants to
establish a policy of informing them about the option of
community placement and providing community placement to those
who are eligible.").

The defendants also contend that no Individual Plaintiff has
claimed an injury as the result of actions by the DPH.  However,
the plaintiffs have claimed, <u>inter alia</u>, a failure to ensure that
adequate discharge takes place in the facilities as a result of
actions and inaction on the part of DPH.

### d. Adequacy

"A plaintiff can show that it adequately represents the
interests of the class, pursuant to Rule 23(a)(4), if it appears
that plaintiff's interests are not antagonistic to those of the
class it seeks to represent and plaintiff's counsel is qualified
to conduct the litigation."  <u>In re Flight Safety Technologies,
Inc. Sec. Litig.</u>, 231 F.R.D. 124, 128 (D. Conn. 2005).  As to the
first point, the defendants suggest that it has not been
demonstrated by the plaintiffs that the Individual Plaintiffs can
fulfill their obligations to be knowledgeable about the claims
that are being asserted and to supervise class counsel.
However, based on the allegations in the First Amended Complaint
and the subsequently filed affidavits, the court is satisfied

-38-

that the Individual Plaintiffs understand their role.  (See, e.g., Affidavit of Shannon Hemmingsen (Doc. No. 147) ¶ 15 ("I am also aware that I am representing other individuals in this lawsuit.").)

The defendants also argue that Rivera should not be a class representative because of an arrest.  The court, having reviewed his affidavit, disagrees.  See, e.g., German v. Federal Home Loan Mortg. Corp., 168 F.R.D. 145, 155 (S.D.N.Y. 1996)("[M]ost courts have rejected challenges to adequacy based on allegations that plaintiffs backgrounds were alleged to include 'unrelated unsavory, unethical, or even illegal conduct.'").

The defendants argue that the eligibility of the Individual Plaintiffs and other members of the putative class for existing programs differs, so there is a potential for a conflict of interest in light of the competition for the state's limited resources.  However, the First Amended Complaint alleges that community-based care is less costly than care provided in and by the facilities. (See Compl. ¶¶ 6, 94.)  At this point, the conflict of interest is too speculative to be given material weight.  See E.E.O.C. v. Local 638, No. 71 Civ. 2877(RLC), 2004 WL 2414013, *7 (S.D.N.Y. Oct. 28, 2004)(finding that "Local 28's protestations of financial hardship remain merely speculative and are insufficient to defeat a motion for class certification").

### e. Rule 23(b)(2)

Under Rule 23(b)(2), it must be established that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Id.  "The entire purpose behind Rule 23(b)(2) is to resolve disputes concerning the existence of a policy and practice of discrimination against a broad class of individuals." Messier v. Southbury Training School, 183 F.R.D. 350, 357 (D. Conn. 1998);  Jeanine B. by Blondis v. Thompson, 877 F. Supp. 1268, 1288 (E.D. Wis. 1995)("[c]ivil rights cases seeking broad declaratory or injunctive relief for a large and amorphous class . . . fall squarely into the category" of 23(b)(2) actions); Advisory Committee Note to Subdivision (b)(2) ( "Illustrative are various actions . . . where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.").

The defendants' objections are based on a mischaracterization of the First Amended Complaint as alleging that the plaintiffs are entitled to community-based alternatives. However, as discussed above, this is not the gravamen of their complaint.  Rather, the plaintiffs are seeking to require the defendants to cease using methods of administration that subject individuals with disabilities to discrimination, and, instead, to

administer their programs and services in a manner that leads to the most integrated setting appropriate for each putative class member's needs.  For that reason, the court finds the defendants' arguments unpersuasive and concludes that at issue in this case is the existence of an alleged policy and practice of discrimination against a broad class of individuals.

For the reasons set forth above, the court finds that the plaintiffs have satisfied the requirements of Rule 23(a) with respect to numerosity, common questions of law and fact, typicality and adequacy (except with respect to Agatha Johnson), and that the requirements of Rule 23(b)(2) are also satisfied. Accordingly, the motion for class certification is being granted in part and denied in part; the motion is being denied to the extent that it requests that Agatha Johnson be named as a class representative and is being granted in all other respects.

### V. CONCLUSION

For the reasons set forth above Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (Doc. No. 140) is hereby DENIED; Defendants' Rule 12(b)(1) Motion to Dismiss Plaintiffs' First Amended Complaint For Lack of Jurisdiction Since Plaintiffs Lack Standing to Assert the Claims that are Raised Herein (Doc. No. 141) is hereby DENIED; and the Motion For Certification of Class (Doc. No. 129) is hereby GRANTED in part

and DENIED in part.

        It is so ordered.

        Dated this 31st day of March, 2010 at Hartford, Connecticut.


                                    _____
                                               /s/AWT
                                        Alvin W. Thompson
                                    United States District Judge