# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---------------------------------------------------------------- x

| | | |
|---|---|---|
| STATE OF CONNECTICUT OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS WITH DISABILITIES, SHANNON HEMMINGSEN, SAMUEL RIVERA, GALE YENCHA, NORMA JEAN DIAZ, and AGATHA JOHNSON, individually and on behalf of similarly situated individuals, | : | |
| Plaintiffs, | : | Civil Case No. |
| v. | : | 3:06 Civ. 00179 (AWT) |
| THE STATE OF CONNECTICUT, MICHAEL P. STARKOWSI, in his official capacity as Commissioner of the Connecticut Department of Social Services, PATRICIA REHMER, MSN, in her official capacity as Commissioner of the Connecticut Department of Mental Health and Addiction Services, J. ROBERT GALVIN, M.D., M.P.H., in his official capacity as Commissioner of the Connecticut Department of Public Health, | : | |
| Defendants. | : | |

---------------------------------------------------------------- x

**SETTLEMENT AGREEMENT**

This Settlement Agreement is entered into by and between the State of Connecticut Office of Protection and Advocacy For Persons With Disabilities ("OPA"), Shannon Hemmingsen, Samuel Rivera, Gale Yencha and Norma Jean Diaz, individually and on behalf of other similarly situated individuals (collectively, the "Plaintiffs"), and the State of Connecticut, the Commissioner of the Connecticut Department of Social Services ("DSS"), the Commissioner of the Connecticut Department of Mental Health and Addiction Services ("DMHAS") and the Commissioner of the Connecticut Department of Public Health ("DPH")[1] (the Plaintiffs and Defendants are collectively referred to as the "Parties").

[1] Defendants shall mean the Department of Social Services and Department of Mental Health and Addiction Services for the purposes of implementing and complying with the requirements of this Settlement Agreement.

**WHEREAS:**

1. On or about September 9, 2008, Plaintiffs filed their First Amended Complaint (the "Complaint") against Defendants, seeking, inter alia, declaratory and injunctive relief against Defendants to remedy alleged violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. (the "ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. §794 (the "Claims").

2. By order dated March 31, 2010, the U.S. District Court for the District of Connecticut (Thompson, D.J.) (the "Court"), inter alia, granted in part Plaintiffs' Motion for Class Certification and certified a class of individuals who:

   i) have a mental illness or have a record of such an illness or have been regarded as having such an illness and therefore have a disability within the meaning of 42 U.S.C. § 12102(2);

   ii) with appropriate supports and services, could live in the community; and

   iii) are institutionalized in either Chelsea Place Care Center in Hartford ("Chelsea Place"), Bidwell Care Center in Manchester ("Bidwell") or West Rock Health Care Center in New Haven ("West Rock"), or are at risk of entry into these facilities.

3. Chelsea Place and Bidwell are collectively referred to in this Settlement Agreement as the "Nursing Homes." West Rock is no longer operating and is therefore not a subject to the requirements of this Settlement Agreement.

4. Defendants answered the First Amended Complaint and each Defendant denied that it violated the ADA and the Rehabilitation Act.

5. Counsel for the Parties engaged in arms' length negotiations to resolve the Claims asserted by Plaintiffs and now agree to settle the Claims in order to avoid the expense, risks and uncertainty of further litigation.

6. Plaintiffs and their counsel have concluded that the terms of this Settlement Agreement are fair, reasonable and adequate to the Plaintiffs and the Settlement Class (as defined below), and in the Settlement Class' best interests, and have agreed to settle the Claims against Defendants and to use their best efforts to effectuate the settlement pursuant to the terms and provisions of this Settlement Agreement.

**NOW THEREFORE**, it is hereby **STIPULATED AND AGREED**, by and among the Parties, through their respective undersigned attorneys, subject to Court approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, in consideration of the benefits to the Parties and the Settlement Class as set forth in this Settlement Agreement, that all Claims against all Defendants shall be compromised, settled, released and dismissed, upon and subject to the following terms and conditions:

I. Jurisdiction

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as a case arising under the laws of the United States and 28 U.S.C. § 1343(a) for actions under laws providing for the protection of civil rights.

II. Definitions

As used in this Settlement Agreement, the following terms shall have the following meanings:

A. "Class Members" means the persons who, as of the date of approval of this Settlement Agreement by the Court or at any time during the Settlement Period, meet the definition of "Settlement Class" set forth below.

B. "Community-Based Services" means services and supports provided in Connecticut that assist individuals with serious mental illness to live in the community. Such services and supports include, but are not limited to Assertive Community Treatment ("ACT"), Crisis Services, and Supported Employment. Such services shall be limited to those that are funded under the Money Follows the Person program, the Mental Health Waiver and the state-funded services listed in Exhibit A within the limitations on the amount and scope of such services under such programs, including any cost-effectiveness tests on eligibility in such programs, and as determined to be appropriate and necessary to meet the Class Member's needs by the state officials and contractors charged with determining the plan of care for such individuals under said programs utilizing a person-centered planning process.

C. "Community-Based Setting" means the most integrated setting appropriate for each Class Member, where the setting is designed (i) to promote independence in daily living, full participation in society, economic self-sufficiency, the ability to interact with non-disabled persons to the fullest extent possible; and (ii), as determined by the Defendants' officials who are responsible for administering the applicable programs of Community-

Based Services, to meet the needs of the Class Member and enable him or her to receive Community-Based Services in a setting that is safe and appropriate given his or her needs. Community-Based Settings may also include independent housing with the Class Member's family or friends.

D. "Community Service Provider" means a provider authorized by the appropriate Defendants for payment of State funds for the provision of Community-Based Services.

E. "Housing Services" shall mean the provision to eligible Class Members of financial subsidies to secure leasing of apartments or homes in the most integrated setting appropriate for each Class Member. Community-Based Services provided under the Money Follows the Person program, the Mental Health Waiver, and state-funded programs listed in Exhibit A are not provided by providers of housing secured by Housing Services subsidies.

F. "Settlement Class" shall mean individuals who:

i) have a diagnosis of Serious Mental Illness, as defined in 42 C.F.R. § 483.102,

ii) are eligible for and will or have applied for Medicaid-funded services,

iii) have not been admitted to a Nursing Home for treatment under Medicare and discharged within 120 days of admission,

iv) have no source of payment other than Medicaid for the cost of their care at the Nursing Home,

v) who, with appropriate support and services, could live in the community, and

vi) are institutionalized in either of the Nursing Homes as of the date on which the Court so orders a final Order approving this Settlement Agreement, or who are admitted in either of the Nursing Homes during the Settlement Period (as defined below).

G. "Settlement Period" shall mean the period that is four years from the date on which the Court so orders a final Order approving this Settlement Agreement (the "Effective Date") unless modified to an earlier or later date in accord with the provisions of this agreement.

H. "Supported Employment" shall mean intensive, ongoing supports that enable Class Members, for whom competitive employment at or above the minimum wage is unlikely absent the provision of supports, and who, because of their disabilities, need supports, to perform in a regular work setting. Such supports may include the development and implementation of a plan for assuring appropriate consumer community integration and the provision of both supportive counseling and problem-focused interventions in whatever setting is required to enable consumers to manage the symptoms of their illness. Services provided at the worksite must be focused on assisting the individual to manage the symptoms of mental illness, and not to learning job tasks. These interventions will fall primarily in the areas of achieving the required level of concentration and

task orientation, and facilitating the establishment and maintenance of effective communications with employers, supervisors and co-workers.

III. Defendants' Obligations

The Parties agree that the following requirements of this Settlement Agreement shall be used by the Parties, the Remedial Expert and the Court to assess and determine Defendants' compliance with this Settlement Agreement. The Defendants shall implement these requirements within the time frames set forth herein.

1. Placement in Community-Based Settings

A. Subject to the timeframes set herein, during the Settlement Period, Defendants shall ensure that (1) all Class Members who are determined by Defendants as both eligible for Community-Based Services, and to live in Community-Based Settings have been afforded such services in such settings, subject to their informed choice to remain in the Nursing Home or receive Community Based Services in another setting, and (2) no individual (i) who meets the definition of Class Member set forth herein except for being institutionalized at one of the Nursing Homes, (ii) who is eligible for nursing home level of care, (iii) who Defendants have previously deemed eligible for Community-Based Services and (iv) who has not undergone a change of condition after said determination of eligibility, is admitted in one of the Nursing Homes unless, after being fully informed, he or she declines the opportunity to receive such services in a Community-Based Setting.

i) Defendants shall make their best efforts to ensure that within twelve (12) months after the Effective Date, and shall ensure that in no instance longer than eighteen (18) months after the Effective Date (the "Time Periods"), all Class Members who reside at the Nursing Homes on the Effective Date who have exercised informed choice to receive Community-Based Services in a Community-Based Setting within the Time Periods and whom DMHAS and DSS have determined eligible for such services and to move to such settings, shall have been afforded such services in such settings.

ii) Where a Class Member who resided at the Nursing Homes on the Effective Date who has been deemed eligible for Community-Based Services in a Community-Based Setting by DMHAS and DSS first exercises his or her informed choice to receive Community-Based Services in a Community-Based Setting less than 180 days before the end of the Time Period, Defendants shall make their best efforts to afford the Class Member such services in such settings before the end of the Time Period, but in any event no longer than 180 days from when the individual exercised his or her informed choice, except that when physical plant modifications are necessary to provide a Community Based Setting, an additional 20 days shall be allowed to afford such services.

iii) Defendants shall ensure that any Class Members admitted after the Effective Date whom DMHAS and DSS have determined eligible to receive Community Based Services in a Community-Based Setting and who have exercised informed choice to receive such services shall have been afforded such services in a Community-Based setting within one year of their admission to the Nursing Home. When a Class Member admitted after the Effective Date whom DMHAS and DSS have determined eligible to receive Community Based Services in a Community-Based Setting first exercises his or her informed choice to receive Community-Based Services in a Community-Based Setting less than 180 days before the end of the year after his or her admission, Defendants shall use their best efforts to afford the Class Member such services in such settings before the end of the year, but in any event no longer than 180 days from when the individual exercised his or her informed choice except that when physical plant modifications are necessary to provide a Community Based Setting, an additional 20 days shall be allowed to afford such services.

iv) A Class Member who clearly and knowingly refuses to receive Community-Based Services in a Community-Based Setting shall remain a Class Member during the Settlement Period during which time he/she will retain all Class Member protections and

opportunities for Community-Based Services in a Community-Based Setting provided herein.

v) In the event a Class Member retracts his or her informed choice to receive Community-Based Services in a Community-Based Setting less than 90 days before (a) the end of the Time Period set forth in i) and ii) above, or (b) the end of the year after his or her admission as set forth in iii) above the requirements in this paragraph III. 1 A. addressing the time for Defendants to afford such services shall cease to apply.

B. Where a Class Member has a conservator authorized under Connecticut law to determine the type and location of services to be provided to the Class Member, the decision of the Conservator shall be utilized. Nothing herein shall preclude the parties or a Class Member from seeking remedies regarding the decision of a Conservator from the Probate Court as authorized under applicable law.

C. All Class Members whom DMHAS and DSS have determined eligible to receive Community-Based Services in a Community-Based Setting and who have exercised informed choice to receive such services shall be afforded Housing Services based upon the application of eligibility rules governing the receipt of Housing Services as determined by the state officials who are responsible for determining eligibility to receive such services. The receipt of Community-Based Services by an otherwise

eligible Class Member shall not be discontinued or reduced solely because of a change in housing location.

2. Education

A. Within thirty (30) days of the Effective Date, the Defendants shall begin to conduct at the Nursing Homes education activities for Class Members whom DMHAS and DSS have determined eligible to receive Community-Based Services in a Community-Based Setting which provide opportunities for information/education regarding and exposure to Community-Based Services and Community-Based Settings. In conducting such education activities, Defendants shall, among other things:

i) Explain fully the benefits and financial aspects of Community-Based Services and Community-Based Settings including apartment and home settings that may be secured through Housing Services subsidies;

ii) Facilitate, and accompany Class Members on, visits to Community-Based Settings including apartment and home settings that may be secured through Housing Services subsidies;

iii) Assess Class Members' interest in Community-Based Settings including apartment and home settings that may be secured through Housing Services subsidies;

iv) Explore and address the concerns of any Class Member who declines the opportunity to move to a Community-Based Setting or

are ambivalent about such a move, despite being qualified for a Community-Based Setting;

v) Review Class Members' housing preferences quarterly; and

vi) Identify the Community-Based Services each eligible individual needs to transition to a Community-Based Setting.

vii) Inform conservators of class members of their obligation to comply with and the content of Conn. Gen. Stat. § 45a-656(b).

B. Defendants shall require that when their employees and contractors discuss housing options with Class Members, they include information about the option of apartment and home settings that may be secured with Housing Services subsidies, its benefits, and the Supplemental Security Income ("SSI"), rental subsidy, and other income they will receive while receiving Housing Services.

3. Class Members' Decision to Remain in Nursing Home

A. If a Class Member whom DMHAS and DSS have determined eligible to receive Community-Based Services in a Community-Based Setting decides that he or she does not wish to live in a Community-Based Setting, the identity of such Class Member and the reasons underlying the Class Member's decision shall be disclosed to OPA. Defendants shall make good faith efforts to address the reasons identified by the Class Member for remaining in the nursing home that are within their programmatic control, however, an informed decision by the Class Member or, where authorized under Connecticut law a conservator, that the Class Member

will remain in the Nursing Home shall be respected. When a Class Member's conservator either refuses to allow an eligibility determination or the opportunity for the receipt of Community-Based Services in a Community-Based Setting, Defendants will notify the conservator in writing of the requirements of Conn. Gen. Stat. § 45a-656(b). Nothing herein shall preclude the Parties or a Class Member from seeking remedies regarding the decision of a conservator from the Probate Court as authorized under applicable law.

i) In making a decision not to live in a Community-Based Setting, the Class Member must:

1) have an opportunity to express his/her preferences;

2) be informed of a recommended Community-Based Setting in a manner that reflects the Class Member's ability to understand and communicate information; and

3) be provided the opportunity to visit and observe Community-Based Settings of the type recommended.

ii) For a Class Member who refuses to move to a Community-Based Setting, Defendants shall ensure that appropriate employees or contractor staff continue to discuss and recommend Community-Based Settings, with the Class Member. In addition, Defendants shall continue to facilitate, and accompany Class Members who wish to do so, on visits to Community-Based Settings, including

apartment and home settings that may be secured with Housing Services subsidies.

iii) A Class Member who clearly and knowingly refuses placement in a Community-Based Setting shall remain a Class Member during the Settlement Period during which time he/she will retain all Class Member protections and opportunities for placement in a Community-Based Setting provided herein.

4. Eligibility

A. A Class Member shall be eligible to participate in Community-Based Services in a Community-Based Setting, as defined in section II, based upon the application of eligibility rules governing participation in the Money Follows the Person program, the Mental Health Waiver Program, Housing Services, or the state-funded programs listed in Exhibit A, referenced therein as determined by the state officials who are responsible for determining eligibility to participate in such programs utilizing a person-centered planning process. Defendants will ensure that each Class Member is afforded the opportunity to have his or her eligibility for Community-Based Services in a Community-Based Setting determined, and, if deemed eligible as provided herein, the opportunity to receive Community-Based Services in a Community-Based Setting, through a person-centered planning process. Utilization of the person centered planning process established in the programs that constitute Community Based Services as defined in Section II. B. shall satisfy the requirements

of this section. Eligibility determinations will be conducted at a pace sufficient to permit Class Members to be afforded Community-Based Services in Community-Based Settings within the Time Periods set forth in Section III.1.A.

B. Through the person-centered planning process, Defendants shall identify the most integrated setting that is appropriate for the individual, subject to the individual's informed choice of alternative housing. The planning process shall first consider whether, with Community-Based Services, Class Members can live in a Community-Based Setting. Defendants' staff will not recommend an alternative other than an apartment or home setting to be secured through Housing Services subsidies, or a home otherwise owned or leased by the Class Member ("Own Home") or the Class Member's family member ("Family Home"), unless it first determines that one of these settings is not the most integrated setting appropriate. Each eligible Class Member shall be afforded Housing Services to support the housing identified in their person centered planning process.

C. Pursuant to paragraph 6 below, the Remedial Expert will review cases in which Defendants find Class Members ineligible for Community-Based Services in Community-Based Settings under this paragraph, and will review Defendants' determinations regarding which Community-Based Setting is appropriate for an individual Class Member. If the Remedial Expert concludes that Defendants' staff recommended an alternative other than an apartment or home setting secured with Housing Services

subsidies, or the Class Member's Own Home or Family Home, without first determining that one of these settings is not the most integrated setting appropriate, the Remedial Expert will consult with Defendants' staff and may, if necessary, require a redetermination of the decision. Class Members retain their right to individually seek administrative remedies as provided under state law for denial of eligibility for Community Based Services in Community-Based Settings.

5. Defendants' Additional Obligations

DMHAS shall during the Settlement Period continue provide the services of the Nursing Home Diversion and Transition Program, as described in Exhibit A, for Class Members.

6. The Remedial Expert and Dispute Resolution

A. The Parties agree to the appointment of Kevin Martone as the Remedial Expert under this Settlement Agreement. The Remedial Expert shall serve during the Settlement Period, and shall undertake the tasks described herein. The Remedial Expert shall have the duties and responsibilities set forth in this section.

B. **Parties Meetings**. The Remedial Expert shall convene and chair parties meetings and disseminate a written summary of each meeting. The summary shall include action steps and agreements of the parties including timeframes for follow-up activities. During the first year after the Effective Date, meetings shall be held monthly and quarterly thereafter, but may be scheduled at greater intervals at the Remedial Expert's

discretion. The Remedial Expert shall also assist Defendants at their request in developing reporting protocols, class member data and formats for updating the parties on settlement agreement activities.

C. **Evaluation of Compliance**: The Remedial Expert shall independently review the Defendants' compliance with this Agreement. The Remedial Expert shall also attend and observe a reasonable number of person-centered planning meetings to evaluate the effectiveness of the decision-making process and deliberations about the compliance with the obligations set forth in Section III of this Settlement Agreement.

D. **Written Reports**. The Remedial Expert shall provide quarterly reports on each of the areas addressed in the obligations set forth in Section III of this Settlement Agreement. Reports shall describe progress in each area, barriers to implementation, and recommendations to address cited problems. These reports will be distributed to the parties and to the Court. It would be expected that these reports would also be presented and discussed at the parties' meetings. Defendants shall be responsible to respond to the issues and recommendations offered by the Remedial Expert.

E. **Dispute Resolution**. The Remedial Expert will respond to complaints concerning compliance with the obligations set forth in Section III of this Settlement Agreement. In conjunction with the meetings with the parties, the Remedial Expert will assist the parties in dispute resolutions through written proposals to correct the cited area of concern and mediation. In

the event disputes are not resolvable in the Remedial Expert's judgment, the Remedial Expert will memorialize the issues with proposed recommendations to the parties.

F. **Training and Education.** The Remedial Expert shall assist Defendants in developing education and information activities and its implementation as required under the benchmarks.

G. **Family**. The Remedial Expert shall be available to meet directly with the families, guardians or conservators, and advocates regarding community services, community transition recommendations, and the requirements of the Settlement Agreement.

H. **Community Transition**. The Remedial Expert shall review and evaluate all individual community transition plans for their thoroughness, appropriateness and established timetables. The Remedial Expert may also conduct site visits to Community-Based Settings after a Class Member's move.

I. **Budget**: The Remedial Expert shall be compensated by the Defendants in accordance with a contract/agreement, and a budget negotiated by the Defendants and the Remedial Expert, which shall include and be based upon the scope of work called for in the Settlement Agreement, and shall provide for the performance of all of the work required by the role of the Remedial Expert under this Settlement Agreement. The contract/agreement shall address the entire time period for which the Remedial Expert may be retained under this Settlement Agreement, and

the Remedial Expert may submit proposed modifications to the budget to the Defendants annually based upon the scope of work. The Remedial Expert's fees and expenses shall not exceed $600,283 for the Settlement Period unless said period is extended by the Court in accord with Section IV, paragraph 5 of this Settlement Agreement.

J. **Access**. The Remedial Expert shall have access to all documents and data relating to class members and to the Defendants' performance of their obligations under this Agreement in possession of the Defendants, Defendants' agents, contractors, evaluators, and providers necessary to perform his functions, including access to the class members themselves, their conservators, advocates and their programs. The Remedial Expert shall also be free to meet with any of the Parties or their agents on an informal basis to discuss issues relating to settlement agreement activities. All rules, regulations, policies, plans, guidelines, directives, instructions, protocols and other material utilized by Defendants to implement this Settlement Agreement shall be made available to the Remedial Expert. The Parties shall jointly move the Court for an order to the Nursing Homes to allow access by the Remedial Expert and the Parties to class member medical records in possession of the Nursing Homes. The Remedial Expert shall be subject to the protective order entered into by the Court.

K. **Replacement of the Expert.** In the event Mr. Martone cannot or will not continue to serve as the Remedial Expert for any reason, the Parties shall

attempt to agree on a successor Remedial Expert with relevant experience; in the event that they are unable to reach agreement, the Parties will attempt to agree on candidates for Remedial Expert and shall submit the list of candidates to the Court for appointment. The Defendants will use the same methods and procedures for contracting with a replacement remedial expert as set forth herein.

L. **Court Enforcement.** This Agreement shall be subject to the approval of the Court, and. if so approved, shall be entered as a court order. This Agreement and any obligations thereunder shall be enforceable only as follows:

i) Plaintiffs shall notify in writing Defendants and the Remedial Expert of any alleged substantial noncompliance with this Agreement and may request a meeting with the Remedial Expert for the purpose of attempting to resolve the problems identified by the Plaintiffs regarding the Defendants' alleged substantial noncompliance. The Remedial Expert shall attempt to resolve disputes with the parties and allow the Defendants an opportunity to address the issue before certifying the matter to the court in accordance with the procedures set forth herein. As a part of said pre-certification dispute resolution process, Remedial Expert may make recommendations which exceed the requirements of the Settlement Agreement, however, such suggestions are not enforceable against the Defendants.

ii) Should the Parties fail to resolve, through said informal means, the substantial noncompliance identified by the Plaintiffs, then only the following process (hereinafter Compliance Process) shall be utilized. Plaintiffs shall identify the alleged substantial noncompliance unresolved by the Remedial Expert with this Agreement in a written Petition sent to the Remedial Expert and the Defendants who shall respond in writing within three weeks of its receipt. The Remedial Expert may meet further with the parties or other persons, shall in writing make findings and render a compliance determination and as appropriate issue recommendations for compliance with timelines for compliance. As part of the Compliance Process, the Remedial Expert may not recommend actions by the Defendants that exceed the obligations imposed by this Settlement Agreement. The compliance determinations of the Remedial Expert are final except that Defendants retain the right to challenge before the Court any recommendation or compliance determination that Defendants believe exceed the obligations imposed by this Settlement Agreement.

iii) The Remedial Expert shall make a determination within thirty (30) days of the submission of the written statements or other compliance efforts of the Defendants. If Defendants fail in the written opinion of the Remedial Expert to fully implement the

recommendations for compliance issued by the Remedial Expert, Plaintiffs may request in writing that the Remedial Expert certify compliance issues to the Court which shall be granted in the sole discretion of the Remedial Expert. Upon such certification, Plaintiffs may file a motion with the Court seeking a judicial determination that Defendants are not complying with the Agreement and an order to the Defendants to comply with recommendations of the Remedial Expert. Defendants shall have the right to present to the Court their response to the Plaintiffs' petition and respond to the recommendations of the Remedial Expert including submission of a request for modification of the Remedial Expert's recommendations.

IV. Miscellaneous Provisions

1. Settlement Period

A. This Settlement Agreement and the Defendants' obligations hereunder shall remain in effect during the Settlement Period.

B. When in the judgment of the Remedial Expert, the Defendants have fully implemented and accomplished each and every benchmark within the timelines specified, the Remedial Expert shall report to the Court and certify to the Court that Defendants are in compliance. Defendants may then petition for termination of the Settlement Period if such certification has been filed prior to its expiration.

C. The Court shall retain jurisdiction to assure compliance with this Settlement Agreement until the conclusion of the Settlement Period, at which time its

jurisdiction shall terminate unless extended as provided under section IV, paragraph 5 infra.

2. Any modification of this Settlement Agreement shall be executed, in writing, by the Parties, shall be filed with the Court, and shall not be effective until the Court enters an Order approving the modified agreement.

3. This Settlement Agreement shall be applicable to, and binding upon, all Parties, their employees, agents, representatives, assigns, and their successors in office.

4. Nothing in the Agreement shall be construed as an acknowledgment, admission, concession, or evidence of liability by any of the Parties regarding any of the Claims, and this Settlement Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

5. Only after exhausting the dispute resolution process provided by the Remedial Expert, Plaintiffs may move to extend the Court's jurisdiction, which motion shall be granted if the Plaintiffs show by a preponderance of the evidence that Defendants are not in substantial compliance with the Settlement Agreement. Plaintiffs shall not file such a motion unless the Remedial Expert has also found after completion of the dispute resolution process that Defendants are not in substantial compliance with the Settlement Agreement.

6. Attorneys Fees

   In full settlement of all attorneys' fees, costs and other expenses incurred in connection with this litigation, Defendants shall pay, subject to Court review and approval pursuant to Fed. R. Civ. Pro. 23, the amount of $1,300,000 ("Agreed Attorney Fees") to Plaintiffs' counsel. In consideration of the payment of the Agreed Attorney Fees, the plaintiffs, in

their own capacity and as class representatives, and their counsel on behalf themselves and class members, their heirs, successors and assigns, do herewith release and forever discharge the defendants, State of Connecticut, all agencies of the State of Connecticut, and all other present or former officers, agents and employees of the State of Connecticut, their heirs, successors and assigns, in both their official and individual capacities, and the State of Connecticut itself, from all actions, causes of action, suits, claims, controversies, damages and demands of every nature and kind, regarding attorney's fees, costs and expenses, which they, their heirs, successors and assigns ever had, now have or hereafter can, shall or may have for, upon, or by reason arising from this litigation including, but not limited to, any attorney fees and costs incurred before and after the date that this Settlement Agreement is approved by the Court, including attorney fees, costs and expenses incurred from monitoring activities or other participation in work of or interaction with the Remedial Expert, except for fees or costs arising from judicial enforcement where the Court makes a finding of substantial noncompliance by the defendants pursuant to Section III, paragraph 6 L and Section IV, paragraph 5 of this Settlement Agreement. The release of liability set forth in this paragraph for attorney fees, costs and expenses relating to this litigation includes, but is not limited to, all causes of action as have been or may, in the future, be brought in the federal courts, the courts of the State of Connecticut, before the Claims Commissioner pursuant to Conn. Gen. Stat. § 4-141 et seq., or in any other forum asserting rights to attorney fees, costs and expenses arising under the statutes and laws of the United States, and/or the statutes and laws of the State of Connecticut, and such causes of action as may be available under the common law.

7. Costs of Notices

The cost of all notices that may be ordered by the Court consistent with the terms of this Settlement Agreement shall be borne by Defendants.

8. Modification

This Settlement Agreement may not be modified or amended, nor may any of its provisions be waived, except by a writing signed by all Parties hereto or their successors-in-interest.

9. Headings

The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

10. Integrated Agreement

This Settlement Agreement constitutes the entire agreement among the Parties concerning the Settlement and no representations, warranties, or inducements have been made by any Party hereto concerning this Settlement Agreement and its exhibits other than those contained and memorialized in this Settlement Agreement.

11. Counterparts

This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument.

12. Choice of Law

The construction, interpretation, operation, effect and validity of this Settlement Agreement, and all documents necessary to effectuate it, shall be governed by the internal laws of the State of Connecticut without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

13. No Party Is the Drafter

This Settlement Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, and all Parties have contributed substantially and materially to the preparation of this Settlement Agreement.

14. Authorization

All counsel and any other person executing this Settlement Agreement and any of the exhibits hereto, or any related settlement documents, warrant and represent that they have the full authority to do so, and that they have the authority to take appropriate action required or permitted to be taken pursuant to the Settlement Agreement to effectuate its terms.

Dated: April 9, 2014

STROOCK & STROOCK & LAVAN LLP

By: ____________________
Kenneth Pasquale, Esq.
Fed. Bar No. CT 20043
kpasquale@stroock.com
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

-and-

BAZELON CENTER FOR MENTAL HEALTH LAW
BY: ______________________
Ira A. Burnim, Esq.
Lewis Bossing, Esq.
Fed. Bar No. PHV0893
irab@bazelon.org
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
Telephone: (202) 467-5730
Facsimile: (202) 223-0409

-and-

OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS WITH DISABILITIES

BY: ______________________
Nancy B. Alisberg, Esq.
Fed. Bar No. CT 21321
nancy.alisberg@ct.gov
60B Weston Street
Hartford, CT 06120
Telephone: (860) 297-4300
Facsimile: (860) 566-8714

-and-

RELMAN & ASSOCIATES
Michael Allen
Fed. Bar No. PHV0891
mallen@relmanlaw.com
1225 Nineteenth Street, NW
Washington, DC 20036-2456
Telephone: (202) 728-1888
Facsimile: (202) 728-0848

*Co-Counsel for Plaintiffs*

BAZELON CENTER FOR MENTAL HEALTH
LAW
Ira A. Burnim, Esq.
Lewis Bossing, Esq.
Fed. Bar No. PHV0893
irab@bazelon.org
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
Telephone: (202) 467-5730
Facsimile: (202) 223-0409

-and-

OFFICE OF PROTECTION AND ADVOCACY
FOR PERSONS WITH DISABILITIES

BY: ______________________
Nancy B. Alisberg, Esq.
Fed. Bar No. CT 21321
nancy.alisberg@ct.gov
60B Weston Street
Hartford, CT 06120
Telephone: (860) 297-4300
Facsimile: (860) 566-8714

-and-

RELMAN & ASSOCIATES
Michael Allen
Fed. Bar No. PHV0891
mallen@relmanlaw.com
1225 Nineteenth Street, NW
Washington, DC 20036-2456
Telephone: (202) 728-1888
Facsimile: (202) 728-0848

*Co-Counsel for Plaintiffs*

BAZELON CENTER FOR MENTAL HEALTH LAW
Ira A. Burnim, Esq.
Lewis Bossing, Esq.
Fed. Bar No. PHV0893
irab@bazelon.org
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
Telephone: (202) 467-5730
Facsimile: (202) 223-0409

-and-

OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS WITH DISABILITIES

BY: ______________________
Nancy B. Alisberg, Esq.
Fed. Bar No. CT 21321
nancy.alisberg@ct.gov
60B Weston Street
Hartford, CT 06120
Telephone: (860) 297-4300
Facsimile: (860) 566-8714

-and-

______________________
RELMAN & ASSOCIATES
Michael Allen
Fed. Bar No. PHV0891
mallen@relmanlaw.com
1225 Nineteenth Street, NW
Washington, DC 20036-2456
Telephone: (202) 728-1888
Facsimile: (202) 728-0848

*Co-Counsel for Plaintiffs*

Dated: April 11, 2014

STATE OF CONNECTICUT

DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES
By: ______________________
Rosemary McGovern, Fed. Bar No.: ct19594
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel.: (860) 808-5210
Fax: (860) 808-5385
Email: Rosemary.McGovern@ct.gov.

DEPARTMENT OF SOCIAL SERVICES

By: ______________________
Hugh Barber, Fed. Bar No.: ct05731
Assistant Attorney General
Office of the Attorney General
55 Elm Street, 5th Floor
Hartford, CT 06106
Tel.: (860) 808-5210
Fax: (860) 808-5385
Email: hugh.barber@ct.gov.

DEPARTMENT OF PUBLIC HEALTH

By: ______________________
Henry A. Salton, Fed. Bar No. ct07763
Assistant Attorney General
Office of the Attorney General
55 Elm Street, 5th Floor
Hartford, CT 06106
Tel.: (860) 808-5210
Fax: (860) 808-5385
Email: henry.salton@ct.gov.

STATE OF CONNECTICUT

By: ______________________________

Daniel Shapiro, Fed. Bar No. ct20128
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel.: (860) 808-5210
Fax: (860) 808-5385
Email: Daniel.shapiro@ct.gov.

## EXHIBIT A: STATE FUNDED SERVICES AND PROGRAMS

The following program and service descriptions are provided in accord with the provisions of the Settlement Agreement. The statutes, regulations, policies and procedures for each program and service govern eligibility and scope of services determinations and shall govern to the extent there is a conflict with these descriptions.

DMHAS works with a network of 13 *state-operated and private nonprofit funded Local Mental Health Authorities (LMHAs)* to provide treatment and support at the community level. LMHAs are responsible for service coordination, care and case management, linkages with other agencies for service needs such as housing and entitlements, program development and management, utilization review and quality management, information system management, and community relations.

State-Operated:

- Southwestern CT Mental Health System –Bridgeport and Stamford
- Western CT Mental Health Network –Danbury, Torrington, and Waterbury
- Capitol Region Mental Health Center –Hartford
- River Valley Service –Middletown
- CT Mental Health Center –New Haven
- Southeastern Mental Health Authority –Norwich

Private Non Privates:

- Community Health Resources –Enfield, Manchester, and Windsor
- United Services –Willimantic
- Rushford –Meriden and Middletown
- Community Mental Health Affiliates –New Britain
- Intercommunity –East Hartford
- Bridges –Milford
- BH Care –Branford and Ansonia

**DMHAS PROGRAMS:**

- ***Assertive Community Treatment (ACT)*** is a recovery focused, high intensity, community based service for individuals discharged from multiple or extended stays in hospitals, or who are difficult to engage in treatment. The service utilizes an interdisciplinary team to provide intensive, integrated, rehabilitative community support, crisis, and treatment interventions/services that are available 24-hours/7 days a week. ACT includes a comprehensive array of rehabilitative services integrated with medical care, most of which is provided in non-office settings by a mobile multidisciplinary team. The team provides community support services interwoven with treatment and rehabilitative services and regularly scheduled team meetings. Connecticut currently has four (4) designated ACT Teams: 1) Community Health Resources in Manchester, CT; 2) Community Mental Health Affiliates in New Britain, CT; 3) Gilead in Middletown, CT; and 4) Southeastern Mental Health Authority in Norwich, CT. An additional five ACT teams are in the process of being established during 2014.

ACT-like, high intensity services are available in other geographic areas where Community Support Services, Mobile Crisis Teams, and other community resources are lined to ensure individuals receive adequate and appropriate services and supports, as needed.

- ***Mobile Crisis Services*** that assess and treat adults and families in acute emotional crisis in order to stabilize their condition and prevent hospitalization when possible and to arrange for further treatment when necessary. These services are available 24-hours-a-day, 7-days-a-week, emergency mental health workers rapidly assess and treat individuals and families through face-to-face and hotline telephone contacts. These services emphasize reducing suicide risk, risk of harm to others, and likelihood of hospitalization. Emergency services are provided in crisis intervention centers, in general hospital emergency departments, walk-in clinics or by mobile crisis teams. Crisis intervention centers also include short-term crisis and respite beds.

- ***Outpatient Services*** to improve or maintain the psychological functioning of adults who require ongoing clinical treatment through individual or group and family therapy and medication support when necessary. Treatment helps to improve or sustain the level of functioning of adults who might otherwise require hospitalization. Services include traditional outpatient services, intake and evaluation, medication management, and intensive outpatient.

- ***Mental Health Residential Treatment Services*** offer a variety of housing opportunities including group homes, community residences, and supervised housing programs. These services, which vary in intensity with the independence of the living environment, include supervision, counseling and follow-up to assure that individuals receive needed community support and psychiatric services. ***Intensive Mental Health Residential Treatment*** is highly structured and rehabilitative, with twenty-four (24) hour staff supervision, and a length of stay of six (6) to twelve (12) months. This level of care is typically for individuals who are coming directly out of CT Valley Hospital. Admission to the Intensive Mental Health Residential Treatment program comes through a state-operated inpatient facility. ***Mental Health Group Homes*** are designed to assist individuals with serious and persistent mental illnesses to achieve their highest degree of independent functioning and recovery. Access to mental health group home rehabilitative services is provided to those recipients whose mental illness is so serious and disabling as to require care in a group home setting. Necessary rehabilitative services are provided by the group home to *individuals who have significant skill deficits in the areas of self-care, illness management, and independent living* as a result of the psychiatric disability and who require a non-hospital, 24/7 supervised community-based residence. Rehabilitative services are provided in a structured recovery environment, with *on-site staffing twenty-four hours a day, seven days a week.*

- ***Substance Abuse Residential Services*** provide 24 hour programming and containment that relies on a community setting or residential milieu as an effective tool for acquiring recovery skills and basic life skills. The program is designed to effect fundamental personal change for clients who have significant social and psychological problems. Substance use is not the only treatment focus and programs take into account individual client behavior, emotions, attitudes, family, culture, trauma, gender, lifestyle, and overall health.

- ***Housing Supports*** to promote the recovery of individuals by ensuring that recovery-oriented support services are available to support individuals through their recovery process. These services include supervised and supported housing, the PILOTS Supportive Housing program, and the federally funded Shelter Plus Care program. The ***Supportive Housing Development*** is a public/private collaborative effort to foster the development of long-term solutions to the housing and services needs of families and individuals coping with psychiatric disabilities and/or chemical dependency who are facing homelessness. This is accomplished through the leasing of existing scattered site housing and the development of new housing units. The goal of the initiative is the creation of supportive housing units within Connecticut that link individuals and families with targeted employment and service supports. Community-based providers will develop identified housing needs, using approaches that work for both clients and communities.

- ***Intensive Substance Abuse Residential Treatment*** is defined as medically necessary, residential behavioral health services for individuals with substance dependencies delivered in a 24 hour facility. The Contractor shall provide substance use disorder services to individuals with substance use disorders who require an intensive rehabilitation program. The anticipated length of stay for individuals utilizing Intensive Residential Treatment is usually thirty (30) days.

- ***Transitional Housing***, otherwise known as Halfway Houses, are residential programs for people with substance use disorders who have completed some type of residential treatment and are in need of minimal support for maintaining their recovery. The length of stay is general 1-3 months and the focus is finding permanent housing and employment.

- ***Substance Abuse Long term Care*** is the longest type of residential treatment and is appropriate for someone coming out of detox and/or who hasn't been in a Long Term Care program before and who needs a long term length of stay. These are generally people who have a long history of addiction and relapses and who have never been able to maintain any period of sobriety. The program is generally 6-9 months long.

- ***Community Support Program*** assist adults with severe psychiatric disorders or co-occurring severe psychiatric and substance use disorders in achieving and maintaining rehabilitative, sobriety and recovery goals. These services address the mental health/substance abuse treatment needs of individuals as well as provide financial, social, educational, vocational, residential and other treatment and support needs of the individuals. CSP services focus on building and maintaining a therapeutic relationship with the individual while delivering rehabilitative, skill building interventions and activities, facilitating connections to the individual's community recovery supports and emphasizing the individual's choices, goals and recovery path.

- ***Vocational/Rehabilitation*** services and support include vocational counseling an assessment, the development of specific occupational skills, job seeking and retention training, assistance with job search, self-esteem building, life planning, and relapse prevention. In accordance with individual needs, recovery-oriented rehabilitation services provided may include life management, daily living and interpersonal skills. ***Employment Services*** are a set of services that develop opportunities in paid part or full time positions at comparable wages for similar positions within the general labor market, such positions are available to any qualified individual, and are not set aside or reserved for individuals with disabilities. Employment Services program funded by DMHAS and maintain compliance with the Department's fidelity standards.

- ***Access to Recovery (ATR) III*** is a presidential initiative which provides vouchers to adults with substance use disorders to help pay for a range of community-based clinical treatment and recovery support services. The goals of the program are (1) Facilitate genuine individual choice and promote multiple pathways to recovery through the development and implementation of a substance use treatment and recovery support service voucher system; (2) Expand access to a comprehensive array of clinical substance use treatment and recovery support services, including those provided through faith-based organizations; and (3) Ensure each client receives an assessment for the appropriate level of services. All services are designed to assist recipients remain engaged in their recovery while promoting independence, employment, self-sufficiency, and stability.

- ***Nursing Home Diversion and Transition Program*** is a program to ensure that nursing home placements for DMHAS clients (or DMHAS-eligible clients) are necessary, appropriate, and safe. Preadmission Screening Resident Review (PASRR) is an integral part of the program.
  The program focuses on two specific goals: (1) Reducing inappropriate admissions of DMHAS clients to nursing homes; and (2) Transitioning nursing home residents with a mental illness back to the community with support services. To accomplish these goals, DMHAS funds eight Nurse Clinicians, as well as three Case Managers, who work directly with

community providers, nursing home staff, and hospital discharge planners (inpatient and emergency room). Additionally, there is ongoing collaboration with the state's Money Follows the Person Demonstration Project and the Mental Health Waiver .

- ***SSI/SSDI Outreach, Access and Recovery (SOAR)*** SSI/SSDI Outreach, Access and Recovery (SOAR) is designed to serve adults who are homeless or at risk of homelessness and who have mental illness, co-occurring mental health and substance abuse disorders and/or other serious health conditions. SOAR is an approach that helps states increase access to mainstream benefits for people who are homeless or at risk of homelessness through:
  - *Strategic Planning Meeting(s)* to establish collaboration among key state and/or local stakeholders and to develop an action plan for implementing the SOAR approach (e.g. SSA and Disability Determination Services (DDS); State Mental Health Agency and Department of Corrections leadership; and community homeless, health and behavioral health providers).
  - *Training* of case managers using Substance Abuse and Mental Health Services Administration's (SAMHSA), Stepping *Stones to Recovery* curriculum that includes a step-by-step explanation of an improved SSI/SSDI application process. A Train-the-Trainer program allows for expansion and sustainability.

- ***Medication Assisted Treatment***
  This program includes evidence-based approaches proven to assist certain individuals to initiate and/or sustain their recovery. This program allows for clients to direct their own care and define their own goals and recovery path.

- ***Senior Outreach Substance Abuse Services*** provide consultations and education, outreach, home visits, nursing home visits, and age-specific weekly substance abuse group therapy to Older Adults throughout the state.

- ***Screening, Brief Intervention and Referral to Treatment (SBIRT)*** is a program that provides health screeners in 9 FQHCs who provide routine screening with validated instruments; Brief intervention using manual-guided procedures recommended by the World Health Organization (WHO); Brief treatment protocols modeled on a CSAT clinical trial; Differential assessment utilizing standardized diagnostic instruments; and Referral to treatment based on ASAM (2001) criteria. To date 18,254 individuals have been served, with 2,054 receiving Brief Intervention services.

- ***Integrated Dual Diagnosis Treatment model and Co-occurring Diagnosis Initiative*** in which all 13 LMHAs have implemented the Integrated Dual Disorders Treatment model with increasing fidelity levels and positive treatment outcomes of less substance use and fewer mental health symptoms reported.

- ***The General Assistance Behavioral Health Program (GA BHP) Intensive Case Management (ICM), Alternatives to Hospitalization (ATH), and Opioid Agonist Treatment Protocol (OATP)*** provides intensive case management services to high utilizers.

- ***Trauma Initiative***
  The primary goal of the ***Trauma Initiative*** is to deliver behavioral health care that is sensitive and responsive to the needs of men and women who have experienced psychological trauma. Training and professional development with clinicians and clinical case managers in the DMHAS system of care is preparing them to provide screening, education, and treatment groups. Trauma services are being developed based on the guiding principle that treatment must be informed by a sound scientific, clinical, culturally relevant, and humanistic understanding of the impact and impairment caused by traumatic stress.

- ***Peer Bridger Model – in development***
  This program is to serve individuals with mental health disorders or co-occurring mental health and substance use disorders who are involved with the Probate Court System and have a history of difficulty using traditional tools and services available in the current behavioral health system to gain a stable and fruitful lifestyle in the community. The Peer Bridger Program will consist of highly trained staff persons who have lived experience of severe and persistent mental health disorders or co-occurring mental health and substance use disorders. These individuals will make themselves available as peer supporters to persons with mental health disorders/co-occurring mental health and substance use disorders who have been designated as having an ongoing relationship with or who are at risk of having an ongoing relationship with CT Probate Courts. A request for the offering of this service to an individual may come from an individual, LMHA, hospital or from the Probate Court. A relationship is offered and built based on mutual support, respect and shared backgrounds and perspectives. As the relationship evolves, the Peer Support Specialist and the individual who is offered the service will spend time together in the community sharing their world view, hopes and dreams, challenges and frustrations and support each other in the creation of a more satisfying and stable life.

- ***Guardian Ad Litem (GAL) (aka Melissa's Project)***
  DMHAS supports the GAL program which provides case management to

individuals age eighteen or older who have serious and persistent psychiatric disorders, or co-occurring psychiatric and substance use disorders who are medically indigent. Case management services are a set of services provided to individuals with routine or intermittent low-intensity support needs, including health issues, for the purpose of assisting the individuals to access and use community resources and supports. This service assists individuals in achieving the optimal quality of life, allowing them to live successfully in the community.