State of Connecticut Office of Protection and Advocacy for Persons with Disabilities, et al. v. The State of Connecticut, Department of Social Services, Department of Mental Health and Addiction Services and Department of Public Health

Second Quarterly Report of the Remedial Expert
January 1, 2015 – March 31, 2015

Date: July 28, 2015
Submitted by: Kevin Martone, Remedial Expert
31 Saint James Avenue, Suite 950
Boston, MA 02116
(617) 266-5657 x 129
kmartone@tacinc.org

## I. Background

This is the second Quarterly Report issued on the status of compliance with the provisions of the Settlement Agreement in *State of Connecticut Office of Protection and Advocacy for Persons with Disabilities, et al. v. The State of Connecticut, Department of Social Services, Department of Mental Health and Addiction Services and Department of Public Health*.[1] This Report documents and discusses the State's efforts to meet its obligations for the period Janaury 1, 2015 through March 31, 2015.

This litigation was originally filed by the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities in February 2006 and amended in September 2008 alleging that over 200 individuals with mental illness were unnecessarily residing in or at risk of entering certain (three) nursing homes in violation of the Americans with Disabilities Act and the Rehabilitation Act. In March 2010, a Class was certified by the Court. Subsequently, one of the three nursing homes at hand closed, leaving Chelsea Place and Touchpoints (formerly Bidwell) as the two homes where Class Members reside. A Settlement Agreement was filed on April 11, 2014 that establishes eligibility criteria, tasks and timeframes for the State to facilitate the placement of Class Members into community-based settings.

The Settlement Agreement authorizes the Remedial Expert to independently review the Defendants' compliance with this Agreement and enumerates additional tasks for the Remedial Expert in support of this role.[2] Quarterly Reports are to address each of the areas "in the obligations set forth in Section III of this Settlement Agreement. Reports shall describe progress in each area, barriers to implementation, and recommendations to address cited problems…….Defendants shall be responsible to respond to the issues and recommendations offered by the Remedial Expert."[3]

[1] Case 3:06-cv-00179-AWT, Document 297-1. Filed April 11, 2014. The Settlement Agreement was approved by the Court on July 2, 2014.
[2] Settlement Agreement, Section III, 6, C
[3] Settlement Agreement, Section III, 6, D

For purposes of this report, the Defendant agencies are collectively identified as the "State" unless specific reference to a state agency is needed.

## II. Activities of the Remedial Expert

Activities of the Remedial Expert for the second reporting quarter consisted of the following:

- Monthly review of the State's Data Tracking Tool;
- Facilitation of monthly meetings with parties;
- Preparation of monthly meeting summaries;
- Meeting on January 20, 2015 with State at the Department of Social Services to review records and discuss documentation;
- Participation at clinical team meetings at Chelsea (January) and Touchpoints (February)
- Review of various State records of Class Members
- Meeting with Class Member R.D. at Chelsea (Janaury 2015)
- Meeting with Class Member B.M. at Touchpoints (February 2015)

## III. Statistics

For the Quarter ending March 31, 2015, the State provided the following data about Class Members. Two Class Members were documented as having been discharged from Chelsea Place to an apartment setting during the quarter.

Table 1a: Chelsea Place Class Member Data

| **Chelsea Place** | |
|---|---|
| Skilled Nursing Facility Residents | 250 |
| Class Members | 36 |
| Eligible for Community-Based Services | 9 |
| Not Eligible for Community-Based Services in Community-Based Setting | 27 |
| • Ineligible due to being over Waiver Cost-cap | 23 |
| • Client Refused Community-based Services | 18 |
| • Conservator Refused Community-based Services for Client | 4 |

*The State found that several individuals ineligible for community-based services for more than one of the reasons above.

Table 1b: Touchpoints Class Member Data

| **Touchpoints** | |
|---|---|
| Skilled Nursing Facility Residents | 140 |
| Class Members | 30 |
| Eligible for Community-Based Services | 11 |
| Not Eligible for Community-Based Services in Community-Based Setting | 19 |
| • Ineligible due to being over Waiver Cost-cap | 14 |
| • Client Refused Community-based Services | 17 |
| • Conservator Refused Community-based Services for Client | 6 |

*The State found that several individuals ineligible for community-based services for more than one of the reasons above.

Table 2a: Chelsea Place Community Placement Data

| **Discharges to Community-based Settings for Quarter: Chelsea Place** | |
|---|---|
| • Apartments | 2 |
| • Medicaid Rehab Option (MRO) Home | 0 |
| • Residential Care Home (RCH) | 0 |
| • Assisted Living Service Agencies (ALSA) | 0 |
| • Against Medical Advice (AMA) | 0 |
| Total Class Members Discharged to Community-based Settings | 2 |

Table 2b: Touchpoints Community Placement Data

| **Discharges to Community-based Settings for Quarter: Touchpoints** | |
|---|---|
| • Apartments | 0 |
| • Medicaid Rehab Option (MRO) Home | 0 |
| • Residential Care Home (RCH) | 0 |
| • Assisted Living Service Agencies (ALSA) | 0 |
| • Against Medical Advice (AMA) | 0 |
| Total Class Members Discharged to Community-based Settings | 0* |

* The State reported that one individual was discharged from Touchpoints during this quarter, but the information has not been verified as of the date of this report.

## IV. Brief Summary of Observations to Date

This quarterly report reflects this writer's observations based on two quarters of implementation of the settlement agreement. Since the settlement is still early in implementation, many of the activities for this quarter were still focused on process related issues. However, this writer has been able to establish contacts at the nursing facilities and begun to speak with Class Members.

1. <u>Class Members and progress toward community-base settings</u>

This settlement agreement contains a relatively small settlement Class, and a smaller group of Class Members whom the State has found eligible for community-based services. Of the 390 total nursing homes residents in Chelsea and Touchpoints, there are 66 residents whom the State has found to be Class Members, with 20 deemed eligible for community-based services. Two people were discharged to a community-based setting during this quarter. The three reasons that 46 Class Members are currently ruled out as eligible for community-based settings include the following:

- Resident ineligible due to being over waiver cost-cap;
- Resident refused community-based services;
- Conservator refused community-based services for resident

The 20 residents who are eligible are in various stages of working toward community-based settings, and all have very complex behavioral and/or physical conditions that require the development of comprehensive, person-centered service plans and special considerations for the type of housing arrangement.

The discharge planning process generally involves clinical staff from the nursing home, the State team and its contracted providers working together with the resident to determine the type of housing placement that the resident wants and can benefit from. Sometimes, the type of housing setting a resident prefers is different than the type of setting the nursing home, State team and/or the contracted provider recommends. In these situations, the State team will attempt to arrange for the necessary supports needed to adequately support the resident. However, if the State believes that an individual's needs are greater than what can be provided in the resident's preferred setting, the nursing home and State will work with the resident to facilitate placement to a setting that is safe and most appropriate to their needs. Once the type of community-based setting is determined and a specific location is identified, the goal is to facilitate the transition in a timely manner. An individual may be put on a waiting list if there are no openings in the desired location. The settlement agreement contains established timeframes for when a Class Member should be placed in a community-based setting.

In some instances, there is agreement on the type of setting, but the Class Member only wants to live in a particular geographic area which may limit options in the community. Consistent with the Settlement Agreement, the parties have agreed that if a resident is offered a reasonable placement and refuses, then this will not be held against the State's obligations under the settlement agreement so long as the State continues to document and work with the Class Member to facilitate placement in a community-based setting.

This writer has begun to meet with Class Members as a way to learn about their experiences in the discharge planning process, preferences for community-based settings, and whether their needs are being addressed appropriately in transition plans, among other issues related to the settlement. This writer anticipates that the frequency of interactions with Class Members will increase over the next several quarters.

2. Plaintiff Request Regarding Eligibility Determinations:

The Plaintiffs expressed concern about the number of nursing home residents who have been determined to be Class Members in a communication to Henry Salton, Assistant Attorney General on February 5, 2015. In general, a low number of individuals have been determined to be Class Members compared with the total number of residents at both nursing homes (See Section III Statistics above). Plaintiffs perceived that several individuals who were determined not to be Class Members as a result of a primary diagnosis of Dementia may have been ruled out of the Class inappropriately.

The responsibility for clinical diagnosis and treatment is with the nursing homes,[4] and the State agreed to engage the nursing homes in a process to further assess residents where there was some possibility that the individuals' mental illness was significant enough that they should actually be part of the Class. It should be noted that even if an individual might be ineligible for this settlement Class for various reasons, including Dementia or a related cognitive disorder, the State has an interest in facilitating services in the most effective, cost efficient setting for the individual and works to evaluate individuals for community-based services and programs that could meet their needs. For example, an individual with a mental illness who is not part of the settlement class due to a primary diagnosis of Dementia could still be discharged to a community-based setting through the Connecticut Home Care Program for Elders (CHCPE).

As of the end of this quarter, the State was still looking into the Plaintiff's request. This issue will be reported on further in the Quarterly Report for April – June 2015.

3. Effectiveness of Interaction between State and Nursing Homes:

This writer has begun to participate in transition planning meetings at Chelsea and Touchpoints. These meetings generally involve clinical and administrative staff from the nursing homes, iCare,[5] DMHAS, DSS, and contracted community providers (i.e. Intercommunity, Independence Unlimited, and Community Health Resources). These specific meetings do not include Class Members themselves, and this writer will seek to participate in person-centered planning meetings that involve Class Members in the future. This writer's participation in the meetings has been well received, and the meeting participants appear to have positive working relationships.

This writer encouraged the participants to use the transition planning meetings for collective problem solving since many of the Class Members have unique challenges that sometimes serve

[4] The nursing homes contract out for specialized services such as psychiatry.
[5] iCare is the organization that provides management and administration of Chelsea Place and Touchpoints.

as barriers to community living. In listening to resident updates, it appeared that some of the barriers to discharge identified by iCare are because of behavioral issues. Due to their behavioral health expertise, this writer encouraged the proactive involvement of DMHAS and the contracted providers in helping the nursing home staff to address these issues through appropriate assessment and clinical interventions (e.g. referral for medication adjustments, behavior plans, skill development, linkages to community providers and social supports). In addition, it has been this writer's experience that staff in institutional settings have a generally conservative view of the ability of residents to succeed in community-based settings, and it is important for State and provider staff to educate facility-based staff on the services and supports available in community-based settings.

4. Records and Data Collection:

In addition to interviews with Class Members, information contained in records and the Data Tracking Tool used by the State inform progress on settlement implementation. Records are maintained in various ways. Each nursing home maintains a record with protected health information on each individual. The State also maintains records for Class Members depending on their eligibility for various programs. For example, a Class Member who is eligible for the Money Follows the Person (MFP) program will have an electronic record maintained by DSS. A Class Member whom the State has found ineligible for MFP has a paper record maintained by DMHAS. While the DMHAS records are hard copy, DSS was able to provide to this writer protected electronic access to the MFP records for Class Members. While much of the content is the same across records, the records are different and maintained separately.

During the quarter, this writer reviewed records for several individuals. This writer recognizes that different programs may have different reporting requirements and is not suggesting that everything be standardized. However, this writer reinforced the importance of collecting consistent types of information relevant to individual care and discharge/transition planning to ensure that transition plans for residents are comprehensive. For example, the Waiver Transition Plan Checklist is a document that addresses the key issues that should be addressed for transition to community-based settings whether an individual will receive waiver or state plan services.

In parties meetings this quarter, several forms were modified by the State based on feedback from this writer and the plaintiffs. These included the Informed Consent forms for assessment for eligibility for community-based services and assessment for the type of community-based services that are needed.

The Data Tracking Tool contains data elements tied to key deliverables in the settlement agreement. The State made modifications and additions to the tool based upon feedback from this writer and the plaintiffs during this quarter. Among these included additional summary elements and tracking of the education requirements.

The State has begun capturing and reporting information in the Data Tracking Tool to demonstrate compliance to related measures. The Data Tracking Tool is shared monthly with this writer and the plaintiffs prior to the monthly parties meetings, and is reviewed together during the monthly meetings.

## V. Compliance

For this reporting quarter, the State appears to be compliant with the obligations set forth in Section III of the agreement.

In the settlement agreement, the parties agreed to timeframes for when eligible Class Members should be discharged by. Section III. 1. A sets forth discharge timeframes based on the date of settlement, when a resident is admitted, and when a resident is determined eligible for community-based services. These dates are listed on the Data Tracking Tool and will be one metric used by the parties to determine compliance. Since it is still early in the settlement period, these dates have not occurred yet. Of the discharges that have occurred during the settlement period, most have gone to apartment settings.

However, this writer has cautioned the State to work diligently to place eligible Class Members in community-based settings, especially as it nears the discharge timeframes established in the settlement agreement for several individuals in the next few months. For one Class Member (S.S) this quarter, the individual wanted an apartment setting and was assessed as being capable, but the referral for housing assistance was delayed for two months because, as reported in the team meeting, the care plan was done but "had not been approved yet," the paperwork was "typed and not signed," and "snow days." While this situation did not result in any non-compliance with the State's obligations as written in the agreement, these delays unnecessarily slow the discharge process, cost the State extra money, and could have resulted in an instance of non-compliance had the settlement agreement been further along in implementation. It has been this writer's experience in working with institutional settings that a lack of urgency caused by "red tape" in facilitating discharge to community-based settings, particularly surrounding the housing assessment, search, and transition phase, results in unnecessary extended stays and could have negative clinical consequences. The State did acknowledge the importance and complexity of the housing assistance process and held a housing retreat in March to improve the assessment, referral, and determination process.

While the data entry regarding Education requirements on the Data Tracking Tool had not yet begun during this quarter, this writer has observed documentation of education requirements to Class Members and conservators in the records. This writer will continue to review compliance in this area since this is a fluid process and many Class Members and/or conservators have refused assessment for community-based services. During this quarter, the State legitimately raised the issue of how often to ask individuals about community-based settings who become agitated or continually refuse them. It was reported that for some individuals, asking quarterly creates anxiety and sometimes results in agitation that negatively impacts the individuals and also causes disruptions on the units. The parties agreed that staff should utilize their skills to engage individuals appropriately, clinical judgment should be used to determine whether or not to approach the subject of community-based settings, and staff efforts should be documented. This writer will review records to assess the frequency that this occurs and compliance to the standard.

The two discharges that occurred this quarter are consistent with the settlement terms, with both individuals moving to apartments.

It is significant that over half of the Class Members in each nursing home (Chelsea 61%; Touchpoints 77%) refused assessment for community-based services and/or their conservator refused assessment for community-based services. This writer will request to meet with these individuals and/or their conservators over the next several months to attempt to understand their reasoning and if they have been afforded the opportunities identified in the agreement to make an informed decision. The plaintiffs have indicated that they will engage conservators, as well.

Similar to the provision requiring individuals who have been determined eligible for CBS but who are refusing placement be afforded the opportunity to visit community-based settings,[6] individuals and/or conservators who are refusing to allow the initial assessment for community-based services to occur should be afforded the opportunity to visit and observe community-based settings, when clinically appropriate. While not required in the settlement agreement, some Class Members who could succeed in but are refusing the initial assessment for eligibility to move to community-based settings have been residents of the nursing home for many years and may not fully be aware of the opportunities that exist in community-based alternatives to the nursing home. The opportunity to visit community-based settings may trigger the desire to move to a more integrated setting.

Furthermore, the State has determined that 23 of 36 (64%) Class Members at Chelsea and 14 of 30 (47%) at Touchpoints are ineligible for community-based services due to being over the State-established "cost cap" for waiver services. For many of these individuals, the resident and/or conservator also refused community-based services, but eight of these individuals do want to live in community-based settings but have been deemed ineligible due to the projected greater cost of community-based care to the cost of nursing home care due to their complex needs. In order to ensure cost neutrality when implementing waiver services, states establish cost caps and have the option to do so on an aggregate or individual basis. Connecticut's cost cap is based on an individual basis (i.e. the total spend for each individual will not exceed the cost of institutionalization for the individual) versus the aggregate basis (i.e. the total spend for all waiver recipients does not exceed the aggregate cost of institutionalization for the group). The individuals who exceed the cost cap certainly have documented complex conditions. This writer will review the determinations for individuals who are currently ineligible for community-based services due to being over the cost cap and report to the parties as this work progresses.

## VI. Conclusion

For this reporting quarter, the plaintiffs appear compliant with the obligations set forth in Section III of the agreement.

Of the 390 total nursing homes residents in Chelsea and Touchpoints, the State has found that 66 residents are Class Members, with 20 actually eligible for community-based services. Two individuals were discharged to apartment settings this quarter, and the State is working with the nursing homes and Class Members to identify the settings and services needed for other eligible Class Members to succeed in community-based settings.

[6] Section III. 3. A. i. 3: "In making a decision not to live in a Community-Based Setting, the Class Member must be provided the opportunity to visit and observe Community-Based Settings of the type recommended."

The State, nursing homes, and contracted providers appear to have the constructive relationships necessary to identify the services and housing needed to support Class Members in community-based settings. As implementation of this settlement agreement continues, the State will be challenged, however, to find suitable community-based services for Class Members who could be served in community-based settings. Many of these individuals have complex behavioral and physical health conditions that will require comprehensive services in order to succeed in community-based settings. At issue will be the ability of the State and nursing homes to arrange for the types of settings and services that Class Members need within the timeframes established in the settlement agreement, and if necessary, create new capacity to meet their unique needs.